[No. B119968. Second Dist., Div. Five. May 30, 2000.]

METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA,
Plaintiff and Appellant, v.
IMPERIAL IRRIGATION DISTRICT et al., Defendants and Appellants;
CADIZ INC., et al., Defendants and Respondents.

1404

1406

## COUNSEL

N. Gregory Taylor; Horvitz & Levy, Ellis J. Horvitz, Mitchell C. Tilner and Nina E. Scholtz for Plaintiff and Appellant.

Allen, Matkins, Leck, Gamble & Mallory, David L. Osias, Jeffrey R. Patterson, Mark J. Hattam; Horton, Knox, Carter & Foote and John P. Carter for Defendant and Appellant Imperial Irrigation District.

Daniel Hentschke; Hatch & Parent, Scott S. Slater, Robert J. Saperstein and Stephanie C. Osler for Defendant and Appellant San Diego County Water Authority.

Rapport and Marston and Lester J. Marston for Defendant and Appellant Chemehuevi Indian Tribe.

David E. Ridenour; Morisset, Schlosser Ayer & Joswiak and Mason D. Morisset for Defendant and Appellant Quechan Indian Tribe.

Felger & Associates, Warren P. Felger and Jennifer D. Reisz for Defendant and Respondent Cadiz Inc.

Robert C. Fellmeth and Elisa M. D'Angelo for Defendant and Respondent Center for Public Interest Law.

## OPINION

**TURNER, P. J.—**

### I. INTRODUCTION

State law mandates that the owner of a water conveyance system with unused capacity allow others to use the facility to transport water. The use of a water conveyance facility by someone other than the owner or operator to transport water is referred to as "wheeling." In return for wheeling, the water conveyance system owner is entitled to "fair compensation." (Wat. Code,[1] § 1810.) The question in this case is whether *as a matter of law* the "Wheeling Statutes" (§§ 1810-1814) prevent the Metropolitan Water District of Southern California from adopting a fixed wheeling rate applicable to its member agencies that is based on the volume of water transported without regard to the nature of a particular wheeling proposal, including the distance traveled, or the particular facilities used, and that includes in its calculation capital investment and other system-wide costs. We conclude the Metropolitan Water District could act as it did subject to defendants' right to judicial review pursuant to section 1813. We reverse the judgment to the contrary

---

[1]All further statutory references are to the Water Code except where otherwise noted.

and remand for further proceedings where the parties can litigate the appropriateness of the wheeling rate pursuant to section 1813.

## II. Background

### A. *Procedural History*

The Metropolitan Water District adopted a fixed rate for wheeling transactions by its member agencies. The Metropolitan Water District pledged its expected wheeling revenues as security for certain commercial paper obligations and revolving notes. The Metropolitan Water District filed this action to obtain court validation of its wheeling rate. (Code Civ. Proc., § 860 et seq.; 72B West's Ann. Wat. Code—Appen. (1995 ed.) § 109-163, p. 55.) Seven defendants appeared in the trial court. They opposed the Metropolitan Water District's adoption of a fixed wheeling rate.[2] Six of those defendants have appeared in this court. They are: the San Diego County Water Authority[3]; the Imperial Irrigation District[4]; the Chemehuevi Indian Tribe; the Quechan Indian Tribe; Cadiz Inc. (previously Cadiz Land Company, Inc.); and the Center for Public Interest Law (CPIL).[5]

The trial court reached two conclusions as a matter of law based on the language of the Wheeling Statutes. First, the trial court concluded as a matter of law the Metropolitan Water District could not set a fixed wheeling rate in advance of a particular transaction and without regard to the nature of a specific wheeling proposal. Second, the trial court concluded as a matter of law the Metropolitan Water District could not include system-wide costs in calculating its wheeling rate. The trial court's decision will be set forth in greater detail later in this opinion. The trial court entered a judgment against the Metropolitan Water District and in favor of the defendants. The Metropolitan Water District appealed from that judgment. It also appealed from a postjudgment order as to costs and attorney's fees. Several defendants cross-appealed from the postjudgment order.

---

[2]The parties have not argued that the wheeling rate cannot be challenged in a bond validation proceeding.

[3]The San Diego County Water Authority is a public water agency. It is a member agency of the Metropolitan Water District. In fact, the San Diego County Water Authority is the Metropolitan Water District's largest customer. It acquires water for most of San Diego County. It relies on the Metropolitan Water District to satisfy between 90 and 100 percent of its water supply.

[4]The Imperial Irrigation District is a public irrigation district.

[5]The San Diego County Water Authority, the Imperial Irrigation District, and CPIL each filed a separate respondent's brief. Cadiz Inc. joined in the briefs filed by the San Diego County Water Authority and the Imperial Irrigation District. The Chemehuevi Indian Tribe and the Quechan Indian Tribe joined in the brief filed by the Imperial Irrigation District.

## B. *The Wheeling Statutes*

Since 1980, it has been the declared policy of this state to facilitate the voluntary transfer of water. (§ 109, subd. (a).) The Wheeling Statutes were enacted in 1986. (Stats. 1986, ch. 918, § 2, pp. 3171-3173.) These statutes addressed a potential impediment to wheeling transfers. Public and private water rights holders who desired to sell surplus water to other parties could do so only by agreement with water conveyance system owners. Otherwise, there was no practical way to move the water from seller to buyer. Some water conveyance system owners had refused to wheel water or had allowed the movement of water only after protracted negotiations. The Legislature recognized that the sale of excess water could be a source of income for farmers and others experiencing economic hardship while also promoting efficient use of this scare resource. Consequently, the Wheeling Statutes prohibit state, regional, or local public agencies from withholding use of their water conveyance systems by others provided, inter alia, unused capacity is available and fair compensation is paid for the use.

The legislation includes an uncodified statement of legislative intent. It states: "The Legislature hereby finds and declares as follows: [¶] (a) There has been a severe downturn in the state's agricultural economy which has made it difficult for many farmers to meet their financial obligations to the state or, regional or local public agencies for water facilities already in place. [¶] (b) In addition, many agricultural operations and public agencies experiencing financial difficulties or facing default may desire to sell, lease, or exchange water as a means of obtaining financial relief or augmenting their income. [¶] (c) Since the sale, lease, or exchange of conserved water does not result in the forfeiture of an appropriative right to water, the marketing of water may provide financial relief or supplemental income during periods of economic hardship. [¶] (d) It is the policy of the state to facilitate the voluntary sale, lease, or exchange of water or water rights in order to promote efficient use. [¶] (e) The sales, leases, or exchanges of water are to be made without injuring any legal user of water and without unreasonably affecting fish, wildlife, or other instream beneficial uses and without unreasonably affecting the overall economy of the area from which the water is being transferred." (Stats. 1986, ch. 918, § 1, p. 3171.)

The Wheeling Statutes, sections 1810-1814, provide in pertinent part as follows. Section 1810 provides in relevant part: "Notwithstanding any other provision of law, neither the state, nor any regional or local public agency may deny a bona fide transferor of water the use of a water conveyance facility which has unused capacity, for the period of time for which that

capacity is available, if fair compensation is paid for that use, subject to the following: [¶] (a) Any person or public agency that has a long-term water service contract with or the right to receive water from the owner of the conveyance facility shall have the right to use any unused capacity prior to any bona fide transferor. [¶] (b) The commingling of transferred water does not result in a diminution of the beneficial uses or quality of the water in the facility, except that the transferor may, at the transferor's own expense, provide for treatment to prevent the diminution, and the transferred water is of substantially the same quality as the water in the facility. [¶] (c) Any person or public agency that has a water service contract with or the right to receive water from the owner of the conveyance facility who has an emergency need may utilize the unused capacity that was made available pursuant to this section for the duration of the emergency. [¶] (d) This use of a water conveyance facility is to be made without injuring any legal user of water and without unreasonably affecting fish, wildlife, or other instream beneficial uses and without unreasonably affecting the overall economy or the environment of the county from which the water is being transferred." Section 1811, subdivisions (c) and (d) define the terms "fair compensation" and "replacement costs" as follows: "As used in this article, the following terms shall have the following meanings: [¶] . . . [¶] (c) 'Fair compensation' means the reasonable charges incurred by the owner of the conveyance system, including capital, operation, maintenance, and replacement costs, increased costs from any necessitated purchase of supplemental power, and including reasonable credit for any offsetting benefits[6] for the use of the conveyance system. [¶] (d) 'Replacement costs' mean the reasonable portion of costs associated with material acquisition for the correction of irreparable wear or other deterioration of conveyance facility parts that have an anticipated life that is less than the conveyance facility repayment period and which costs are attributable to the proposed use. . . ."[7] Section 1812 states: "The state, regional, or local public agency owning the water conveyance facility shall in a timely manner determine the following: [¶] (a) The amount and availability of unused capacity. [¶] (b) The terms and conditions, including operation and maintenance requirements and scheduling, quality requirements, term or use, priorities, and fair compensation." Section 1813 provides: "In making the determinations required by this article, the respective public agency shall act in a reasonable manner consistent with the requirements of law to facilitate the voluntary sale, lease, or exchange of water and shall support its determinations by written findings. In any judicial action challenging any determination made under this article the court shall

---

[6]Offsetting benefits may arise where power is developed by the water being transferred.

[7]Section 1811, subdivision (d) as quoted includes nonsubstantive changes made in 1998. (Stats. 1998, ch. 485, § 161.)

consider all relevant evidence, and the court shall give due consideration to the purposes and policies of this article. In any such case the court shall sustain the determination of the public agency if it finds that the determination is supported by substantial evidence." As will be noted, no hearing has been held to date wherein the Metropolitan Water District's wheeling rate has been examined to evaluate whether its determination was supported by substantial evidence as provided for in section 1813. Section 1814 states, "This article shall apply to only 70 percent of the unused capacity."

### C. *The Pertinent Legislative History of the Wheeling Statutes*

As introduced on January 23, 1986, Assembly Bill No. 2746 called for the payment of "fair market value" for the use of a water conveyance facility with unused capacity to wheel water. "Fair market value" was defined in proposed section 1811 as including, but not limited to, "the reasonable operation and maintenance costs and depreciation costs associated with the conveyance facility use, offset by enhanced revenues, if any, realized by the public agency." (Assem. Bill No. 2746 (1985-1986 Reg. Sess.) § 2, as introduced.) Assembly Bill No. 2746 as introduced also provided in sections 1812-1814 that if a transferor and an owner of a conveyance facility could not mutually agree upon a fair market value, the Department of Water Resources[8] would recommend to the State Water Resources Control Board[9] the fair market value for the use. Then the State Water Resources Control Board, after notice and an opportunity for hearing, would determine the fair market value subject to judicial review. (*Ibid.*)

In an analysis of Assembly Bill No. 2746, the Department of Water Resources expressed concern "that the value finally determined not be less than the use charge to long term water contractors which are being served by the facility." (Dept. of Water Resources, analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) Mar. 18, 1986, as introduced.) It observed that the effect of the bill would be "limited" because "few water conveyance facilities in the state have unused capacity." (*Ibid.*) The Department of Water Resources recommended, "The definition of 'fair market value' should be expanded to include administrative costs and to provide that the figure not be less than the use charge to long term water supply contractors." (*Ibid.*)

[8]The Department of Water Resources is a state agency vested with authority over water matters. (See §§ 120 et seq., 225 et seq.) The Department of Water Resources operates the State Water Project which supplies water to users from San Francisco to Southern California. The public water agencies that receive State Water Project water serve approximately two-thirds of all Californians.

[9]The State Water Resources Control Board is a regulatory agency. It determines, among other things, the amount of surface water that may be appropriated and the terms and conditions under which it may be used.

Assembly Bill No. 2746 was amended in the Assembly on April 2, 1986. The definition of "fair market value" was changed to, " 'Fair market value' means the marginal cost to the owner of a conveyance facility operator to provide the service and a markup of 6 percent to compensate the owner for the cost of doing business." (Assem. Amend. to Assem. Bill No. 2746 (1985-1986 Reg. Sess.) Apr. 2, 1986, § 2.) In an analysis of the bill as amended, the Department of Water Resources again objected to the amount of compensation to be paid to an entity that wheeled water. It stated: "The definition should focus on a pro rata share of the capital and other costs of the facility. If a transferor paid only the marginal costs, the transferor could pay much less than the long term contractors who helped finance the facility." (Dept. of Water Resources, Analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) as amended Apr. 2, 1986, Apr. 30, 1986.)

The bill was referred to the Assembly Committee on Water, Parks and Wildlife. An analysis prepared for an April 10, 1986, hearing before that committee stated: "Proponents of the bill argue that farmers who view water trading as a means to continue farming through the efficient use of their water[] fear that powerful water districts will stop water trades by prohibiting use of district-owned water canals. Proponents of the bill argue that if this happens, there will be no way to transfer water from one area to another, thereby frustrating efforts to facilitate water transfers. [¶] . . . Opponents of the bill argue that its mandatory provisions are inconsistent with existing state policy to encourage the voluntary sale, lease, or exchange of water or water rights. In addition, opponents argue that the owner of the conveyance facility should be able to determine the fair market value for its use, not the State Water Resources Control Board acting as an arbitrator." (Assem. Com. on Water, Parks and Wildlife, Analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) as amended Apr. 2, 1986, Apr. 10, 1986.) These statements in support and opposition are repeated in subsequent bill analyses.

The bill was further amended in the Assembly on April 22, 1986. The provisions calling for involvement of the Department of Water Resources and the State Water Resources Control Board in the fair market value determination were removed. The definition of "fair market value" was changed to, ". . . not more than the pro rata capital and operation and maintenance cost plus the incremental operation and maintenance cost to the owner of a conveyance facility operator to provide the service and a markup of 6 percent to compensate the owner for the cost of doing business." (Assem. Amend. to Assem. Bill No. 2746 (1985-1986 Reg. Sess.) Apr. 22, 1986, § 2.) According to the Legislative Analyst, the Department of Water Resources "indicate[d] this definition of fair market value is sufficient to

cover their costs of providing this service." (Legis. Analyst, analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) as amended Apr. 22, 1986.)

An analysis of Assembly Bill No. 2746 as amended on April 22 was prepared for the Assembly Committee on Water, Parks and Wildlife on May 13, 1986. It observed, "Water contractors argue that [the] bill could interfere with their ability to meet contract payments if the user of their facility undercuts prices and steals away a customer." (Assem. Com. on Water, Parks and Wildlife, analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) as amended Apr. 22, 1986.)

An Assembly "Republican Analysis" of the bill prepared on May 13, 1986, listed supporters of the bill as including the Farm Bureau and the Planning and Conservation League. Opponents included the Metropolitan Water District, the Los Angeles Department of Water and Power, State Water Contractors, the Municipal Utility Districts Association, and the State Chamber of Commerce. The analysis commented as follows: "Proponents feel it will help them market their water, something they want to do because they haven't been able to make any money farming with it. Opponents argue the bill is unnecessary to accomplish transfers. Opponents strongly oppose making it mandatory to provide services, when this should be reached by consenting parties. <u>Although the bill does not appear to be needed to accomplish water transfer when there is a willing buyer and seller, it will lessen institutional barriers to water transfers</u>. Water contractors argue that [the] bill could interfere with their ability to meet contract payments if the user of their facility undercuts prices and steals away a customer." (Assem. Com. on Water, Parks and Wildlife, Republican analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) May 13, 1986.)

An Assembly third reading analysis of Assembly Bill No. 2746 dated May 22, 1986, observed proponents of the bill were concerned "powerful water districts" would stop water trades by farmers by prohibiting use of their facilities. Opponents objected to the mandatory nature of the bill. (Assem., 3d reading analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) May 22, 1986.)

The bill was passed in the Assembly on May 27, 1986, and sent to the Senate. On June 5, 1986, the bill was referred to the Senate Committee on Agriculture and Water Resources. In a statement before the Senate Agriculture and Water Resources Committee on June 17, 1986, former Assemblymember Richard Katz said: "I have amended the bill . . . and have added definitions to clarify concerns regarding emergencies, unused capacity and

costs. [¶] Most recently, after lengthy negotiations, I have amended the bill to allow the aqueduct owners the control over the terms and conditions of the aqueduct use. [¶] With these amendments I have the support of . . . divergent groups [including] the Metropolitan Water District . . . ." (Assem. Member Richard Katz, Statement before the Sen. Agr. and Water Com., June 17, 1986.)

The bill was amended in the Senate on June 23, 1986, to redefine "fair compensation" in accordance with the author's proposed amendments. The reference to "fair market value" was changed to "fair compensation." "Fair compensation" was defined as: ". . . the reasonable charges incurred by the owner of the conveyance system, including capital, operation, maintenance, and replacement costs, and including reasonable credit for any offsetting benefits for the use of the conveyance system. [¶] . . . 'Replacement costs' mean the reasonable portion of costs associated with pumping or power recovery plants which have an anticipated life which is less than the conveyance facility repayment period and which costs are attributable to the proposed use." (Sen. Amend. to Assem. Bill No. 2746 (1985-1986 Reg. Sess.) June 23, 1986, § 2.) Moreover, language was added to the effect that: "The state, regional, or local public agency owning the water conveyance facility shall in a timely manner determine the following: [¶] (a) The amount and availability of unused capacity. [¶] (b) The terms and conditions, including operation and maintenance requirements and scheduling, quality requirements, term or use, priorities, and fair compensation. [¶] . . . In making the determinations required by this article, the respective public agency shall act in a reasonable manner consistent with the requirements of law to facilitate the voluntary sale, lease, or exchange of water and shall support its determinations by written findings." (*Ibid.*) The bill also provided for judicial review of the agency's determination. (*Ibid.*)

On July 10, 1986, Assembly Bill No. 2746 was again amended in the Senate. The definition of fair compensation was amended to read: " 'Fair compensation' means the reasonable charges incurred by the owner of the conveyance system, including capital, operation, maintenance, and replacement costs, *increased costs from any necessitated purchase of supplemental power,* and including reasonable credit for any offsetting benefits for the use of the conveyance system." (Sen. Amend. to Assem. Bill No. 2746 (1985-1986 Reg. Sess.) July 10, 1986, § 2, original italics.)

The final amendment to Assembly Bill No. 2746 occurred in the Senate on August 11, 1986. The definition of "replacement costs" was revised to read "the reasonable portion of costs associated with material acquisition for the

correction of unrepairable wear or other deterioration of conveyance facility parts which have an anticipated life which is less than the conveyance facility repayment period and which costs are attributable to the proposed use." (Sen. Amend. to Assem. Bill No. 2746 (1985-1986 Reg. Sess.) Aug. 11, 1986, § 2.) The bill was passed in the Senate on August 18, 1986.

A staff analysis of the bill prepared for the Assembly Water, Parks and Wildlife Committee dated August 21, 1986, observed: "Opponents of the bill argue . . . that water rates to consumers who do not benefit from the transfer could increase . . . . Water districts have fixed costs and if water transfers result in any lost sales, increased rates or taxes will result for the remaining customers." (Assem. Com. on Water, Parks and Wildlife, Republican analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) Aug. 11, 1986.)

On August 21, 1986, the Assembly concurred in the Senate amendments and the bill was sent to enrollment. Assembly Bill No. 2746 was signed into law on September 20, 1986. As can be noted from the foregoing, during the legislative process, the language delineating the sums to be paid to an entity for wheeling water was broadened.

### D. *The Metropolitan Water District*

The Metropolitan Water District was created in 1928 under an enabling act of the state Legislature. It is incorporated under the Metropolitan Water District Act.[10] Its mission is to combine the financial resources of cities and communities in Southern California and to bring supplemental water to the area.[11] The Metropolitan Water District is composed of 27 member agencies: 14 cities; 12 municipal water districts; and one county water authority. It is governed by a 51-member board of directors. (See § 109-50.) Each member agency is entitled to at least one director. Each member agency may appoint an additional director for every 3 percent of the total assessed valuation of the Metropolitan Water District's service area that is within the member agency. (§§ 109-51, 109-52.) Voting shares are also based on assessed valuation. (§ 109-55.) The City of Los Angeles has the, most directors (7)

---

[10]The original uncodified Metropolitan Water District Act was enacted in 1927. (Stats. 1927, ch. 429, § 2, p. 695.) It was repealed in 1969 (Stats. 1969, ch. 209, § 550, p. 540) and reenacted as uncodified sections 109-1 et seq. of the Water Code. (Stats. 1969, ch. 209, § 16, p. 493.) The uncodified act is found in 72B West's Annotated California Water Code— Appendix (1995 ed.) section 109-1 et seq. All further references to section 109-1 et seq. of the Water Code are to that appendix.

[11]A metropolitan water district may be organized for the following purposes: "[D]eveloping, storing, and distributing water for domestic and municipal purposes and may provide, generate, and deliver electric power within or without the state for the purpose of developing, storing, and distributing water for such district." (§ 109-25.)

and votes (20 percent). The San Diego County Water Authority, a defendant here, has six directors and 15 percent of the vote. No other member agency has more than five directors and 13 percent of the vote. The board of directors sets policy and guides the actions of the Metropolitan Water District.

The Metropolitan Water District provides about 60 percent of the water used in Southern California. The Metropolitan Water District's service area covers 5,200 square miles. It includes all or parts of Los Angeles, Orange, San Diego, and Ventura Counties. More than 16,000,000 people, half the population of California, live in the Metropolitan Water District's service area. The Metropolitan Water District supplies its 27 member agencies with treated and untreated water at wholesale prices. The member agencies and various subagencies combine water received from the Metropolitan Water District with local water supplies for delivery to their customers. The Metropolitan Water District does not serve retail customers.

The Metropolitan Water District may raise revenue by: charges for water it provides to member agencies (§§ 109-130, 109-133 et seq.); assessing a property tax (§ 109-307); imposing a water standby or availability service charge (§ 109-134.5); imposing a benefit assessment (§ 109-134.6 et seq.); issuing short-term revenue certificates (§ 109-296 et seq.); and incurring bonded indebtedness. (§ 109-200 et seq.) The Metropolitan Water District is empowered, inter alia, to: "[a]cquire water and water rights within or without the state" (§ 109-130, subd. (a)); "[d]evelop, store, and transport water" (§ 109-130, subd. (b)); fix the rates for the sale and delivery of water to member agencies, "and the amount of any water standby or availability service charge or assessment" (§§ 109-130, subd. (d), 109-133 et seq.); and "[a]cquire, construct, operate, and maintain any and all works, facilities, improvements, and property necessary or convenient to the exercise of the powers granted by this section" (§ 109-130, subd. (e)).[12]

The Metropolitan Water District's major sources of revenue are property taxes and charges for water sold to its member agencies. Approximately 75

[12]Provisions governing rates chargeable for the sale and delivery of water to member agencies include the following. Section 109-133 states, "The board shall fix the rate or rates at which water shall be sold. Such rates, in the discretion of the board, may differ with reference to different sources from which water shall be obtained by the district. The board, under conditions and on terms found and determined by the board to be equitable, may fix rates for the sale and delivery to member public agencies of water obtained by the district from one source of supply in substitution for water obtained by the district from another and different source of supply, and may charge for such substitute water at the rate fixed for the water for which it is so substituted." Section 109-134 provides, "The board, so far as practicable, shall fix such rate or rates for water as will result in revenue which, together with revenue from any water standby or availability service charge or assessment, will pay the operating expenses of the district, provide for repairs and maintenance, provide for payment

percent of Metropolitan Water District revenue is generated through rates charged to supply water to its member agencies. Member agencies pay a fixed rate for each acre-foot[13] of water delivered in the "full service," "seasonal storage service," and "interim agricultural water service" categories. The rate charged to member agencies does not depend on the portions of the facilities used or the distance the water travels. Member agencies also pay a treatment surcharge for water treated by the Metropolitan Water District. The Metropolitan Water District asserts that about 85 percent of its costs are fixed and unavoidable, without regard to the amount of water sold. Member agencies pay for those fixed, unavoidable costs of the water conveyance system in a "bundled full-service rate." Member agencies purchase water from the Metropolitan Water District as needed. They are not required by contract or otherwise to purchase any set amount of water.

The Metropolitan Water District owns and operates water conveyance and storage facilities including the Colorado River Aqueduct, which imports water from the Colorado River; over 775 miles of pipelines and canals; water treatment plants; reservoirs; dams; and pumping facilities. The Metropolitan Water District describes its water conveyance system as "flexible," "integrated," and "weblike," as opposed to "linear." The Metropolitan Water District is currently constructing the Eastside Reservoir Project, a surface water reservoir. Also "pending" is the Inland Feeder Project which involves integration of two aqueducts and the Eastside River Project. The Metropolitan Water District issues bonds to finance construction or to purchase facilities. Debt service and operation and maintenance costs for the Metropolitan Water Districts infrastructure are included in water rates charged to member agencies. The Metropolitan Water District has voluntarily instituted water conservation, alternative source, and recycling programs. As part of that effort, the Metropolitan Water District pays member agencies to develop alternative water sources. Costs associated with these programs are included in the fixed rate member agencies pay for water purchased from the Metropolitan Water District.

The Metropolitan Water District contracts on a "take-or-pay" basis with the Department of Water Resources for an entitlement in the State Water Project. The State Water Project transports water from Northern California

---

of the purchase price or other charges for property or services or other rights acquired by the district, and provide for the payment of the interest and principal of the bonded debt subject to the applicable provisions of this act authorizing the issuance and retirement of the bonds. Those rates, subject to the provisions of this chapter, shall be uniform for like classes of service throughout the district."

[13]An acre-foot of water is the amount of water necessary to cover one acre of land with water one foot deep.

to Southern California. The Metropolitan Water District is the largest of the State Water Project's 29 long-term contractors. It contracts for about one-half of the water supplied by the State Water Project. The Metropolitan Water District is required to pay for its entitlement irrespective of whether it receives water. The annual payment includes a proportionate share of the costs of constructing and operating the State Water Project facilities used to provide water to the Metropolitan Water District. The Metropolitan Water District's State Water Project costs are recouped in large part through water sales to member agencies.

### E. *Metropolitan Water District's Wheeling Rates*

On January 14, 1997, by resolution of its board of directors, the Metropolitan Water District adopted a fixed wheeling rate for its member agencies "during non-shortage periods" of $141 per acre-foot[14] for untreated water.[15] Twenty-six of the Metropolitan Water District's 27 member agencies voted, through the Metropolitan Water District's board of directors, to adopt the fixed rate. The San Diego County Water Authority was the sole dissenting member agency.

The Metropolitan Water District board of directors also adopted specified "Wheeling Principles." Those principles state: "Any wheeling arrangement, whether short-term or long-term, that uses the Metropolitan system should comply with all of these principles. Wheeling arrangements should be discussed in an open manner among the wheeling parties, Metropolitan staff, Directors and member agencies, to allow for a thorough understanding of the effects of the transaction and adherence to the ten policy principles. [¶] These principles have been developed within the framework of general principles of fairness and equity that Metropolitan and its Board and member

---

[14]The Metropolitan Water District resolution also provided that "wheeling rates for the period after June 30, 1997 shall be set annually as part of Metropolitan's rate-setting practice . . . ."

[15]The Metropolitan Water District also adopted a wheeling rate of $262 per acre-foot which allowed member agencies to *reserve* unused capacity in the water conveyance system. The trial court ruled the Wheeling Statutes do not authorize such a rate. The Metropolitan Water District expressly does not challenge that ruling. As stated in its opening brief, "[The Metropolitan Water District] accepts the court's ruling that sections 1810-1814 do not require [it] to guarantee capacity or reserve storage spaces and thus do not authorize a firm wheeling rate. [The Metropolitan Water District's] appeal involves only the nonfirm wheeling rate." In its reply brief, the Metropolitan Water District stated it does *not* concede that its firm wheeling rate "was set in violation of the wheeling statutes." Rather, the Metropolitan Water District noted, "It simply acknowledge[s] that, as the trial court found, the additional firm wheeling rate services—including guaranteed capacity and reserved storage space—are not required by sections 1810-1814, and therefore the wheeling statutes are inapplicable to that rate."

agencies believe should be universally applied to Metropolitan programs. Such fairness and equity principles include: [¶] 1. Metropolitan customers receiving comparable service will pay comparable costs for services. [¶] 2. Metropolitan's programs should be designed and implemented to provide regional water resources benefits and should not result in financial harm to individual or groups of members in the service area. [¶] 3. Metropolitan programs will not result in adverse water quality impacts. Mitigation measures should be considered whenever reasonably and feasibly accomplished. [¶] Given these general principles, wheeling service should be provided subject to the following ten principles: [¶] 1. Level Playing Field. Metropolitan customers receiving comparable service must pay comparable costs for the service. [¶] 2. Cost Recovery. Wheeling charges must fully recover reasonably allocable fixed and variable costs of conveying water through Metropolitan's system. [¶] 3. Financial Impacts. Use of Metropolitan's system for wheeling must not result in increased costs or financial harm to nonparticipating member agencies. [¶] 4. Capital Commitments. Metropolitan's wheeling charges must recover a fair share of committed capital expenditures on the same basis as for customers receiving comparable service. [¶] 5. Recognition of Wheeling Benefits. Wheeling arrangements will account for measurable benefits to the Metropolitan system on a case-by-case basis as mutually agreed by the wheeling party and Metropolitan. [¶] 6. Wheeling Capacity. The use of Metropolitan's delivery system for wheeling of water supplies must not result in a reduction in Metropolitan's ability to meet its water service demands from its member agencies. [¶] 7. Reliability. Use of Metropolitan's delivery system for the wheeling of water supplies must not result in a reduction in reliability to member agencies. [¶] 8. Water Quality. Wheeling must not result in adverse water quality impacts. Mitigation measures should be considered whenever reasonably and feasibly accomplished. [¶] 9. Resource Management. Wheeling policies and arrangements must be consistent with the commitment of Metropolitan and its member agencies to water management programs, such as reclamation and conservation. [¶] 10. Wheeling Preference. Metropolitan should give priority to wheeling arrangements for member agencies before arrangements for non-members."

The Metropolitan Water District's wheeling rate is based on the amount of water transported without regard to the source of the water, the facilities used, or the distance traveled. The rate is based on the same "transmission-related costs" that the Metropolitan Water District includes in the rates it charges for the water it sells to member agencies. These transmission-related charges compensate the Metropolitan Water District for its capital investment and system-wide costs. The transmission-related costs include: "debt

service, operations and maintenance expenses, and take-or-pay contract costs associated with aqueducts and pipelines which deliver water from the supply sources to storage facilities, treatment plants and customer service connection points"; "[State Water Project] costs identified as transportation (both capital and operations and maintenance), the costs of operating and maintaining the [Colorado River Aqueduct] and in-basin systems, and the costs of planning and constructing transmission facilities, . . . the costs of operating and maintaining regulating reservoirs . . ." and 50 percent of the Metropolitan Water District's "Water Management Programs branches' expenses." The transmission costs are discounted for wheeling transactions to take into account the fact that wheeling can occur only when unused capacity is available. The Metropolitan Water District describes the $141 per acre-foot rate as equal to that charged to member agencies purchasing Metropolitan Water District water less the costs of providing an increment of water. In 1997, the Metropolitan Water District charged its member agencies $349 per acre-foot of untreated water, including transportation costs.

The wheeling rate applies only to member agencies. Rates for entities other than member agencies are to be established by the Metropolitan Water District Board of Directors on a case-by-case basis "consistent with applicable law, [the Metropolitan Water District resolution adopting the fixed wheeling rate], and the Wheeling Principles adopted by the [Metropolitan Water District] Board [of Directors] . . . ." Power costs are excluded from the $141 per acre-foot charge. Member agencies will be charged only the incremental cost to purchase power necessitated by the wheeling transaction. (§ 1811, subd. (c).) Treatment costs are also excluded from the $141 per acre-foot charge. If treatment is necessary, the cost will be paid by the transferor. (§ 1810, subd. (b).) The Metropolitan Water District will also determine offsetting benefits on a case-by-case basis. (§ 1811, subd. (c).) The Metropolitan Water District reserved the right to interrupt the transportation service "for any reason, including operational needs, water quality needs, changes in customer demands, maintenance requirements, or other similar conditions."

In setting its wheeling rate, the Metropolitan Water District reasoned that to maintain its operational and financial integrity and to avoid adverse impact upon rates and charges to other member agencies it must factor system-wide costs into the rate. The Metropolitan Water District was concerned that if water sales to member agencies were displaced by wheeling transactions (that is, if member agencies wheeled non-Metropolitan Water District water from other sources, instead of purchasing Metropolitan Water District water), and if the Metropolitan Water District were unable to charge

wheelers for its capital investment and system-wide costs, it would be required to: scale back or drop its voluntary water conservation and recycling programs; shift the costs to its member agencies in the form of increased water rates; or require the taxpayers to bear the costs in the form of increased taxes. The Metropolitan Water District was concerned that wheeling transactions by member agencies would put at risk its investment in facilities, its capital improvements, its water management programs, and its ability to meet its State Water Project costs. Wheeling member agencies, it reasoned, should not be able to use the water conveyance system at a cost far below that charged to member agencies purchasing Metropolitan Water District water. If they were so allowed, the remaining member agencies as well as the taxpayers would in effect be forced to subsidize in material part the wheeling transactions. The Metropolitan Water District concluded: member agencies receiving comparable service must pay comparable costs for the service; wheeling transactions should not cause harm, in terms of reliability, quality or financial impact, on nonparticipant member agencies; wheeling charges must fully recover properly allocable fixed and variable costs of conveying water through the Metropolitan Water District's system; and in short, "if a member agency purchasing water from [the Metropolitan Water District] pays for the fixed, unavoidable costs of the system, including transmission and storage and supply, in a 'bundled' full service rate, then member agencies using that same system for wheeling must contribute to [the Metropolitan Water District's] fixed costs on an equivalent basis."

The explanation of the basis for the wheeling rate assumes in part that a member agency wheeling water purchased from a third party would otherwise have bought water from the Metropolitan Water District. Therefore, the wheeling rate at issue should logically apply only when Metropolitan Water District water is available. Indeed, the Metropolitan Water District's resolution adopting the wheeling rate states: "That wheeling rates for member agencies *during non-shortage periods* shall be . . . a rate equal to $141 per acre-foot . . . ." and "[t]he rates for wheeling by member agencies *during shortage periods* . . . shall be established by the Board on a case-by-case basis in response to specific requests for wheeling, consistent with applicable law, this Resolution, and the Wheeling Principles adopted by the Board at its November 19, 1996 meeting." (Italics added.) Moreover, in its brief on appeal, the Metropolitan Water District states: its wheeling rate "does not apply in years of water shortage"; and "the wheeling rate at issue here would *not apply* during a shortage period for the very reason that, when Metropolitan is short of water, no water revenues are lost as a result of wheeling." (Original italics.) However, defendants are apparently unconvinced that the Metropolitan Water District would apply the fixed rate only

when a wheeling transaction by a member agency displaces a sale of Metropolitan Water District water to that agency.[16] Defendants also appear to conclude that any rate determined during a shortage period would, like the rate at issue here, include system-wide costs.

## F.   *The Trial Court's Decision*

The trial was ordered bifurcated. The trial court identified the "two purely legal issues" to be tried in the first phase as whether, under sections 1810-1814, "[the Metropolitan Water District] may include all of its system-wide costs in calculating its wheeling rates, or instead only costs relating to particular facilities" and "whether [the Metropolitan Water District] may set 'postage stamp' wheeling rates, in advance and without regard to any particular wheeling transaction." The trial court concluded, "The issue presently at hand is not whether the terms and conditions for wheeling transactions set by [the Metropolitan Water District] are reasonable in the abstract, but whether [the Metropolitan Water District] has set its wheeling rates in a manner consistent with the requirements of the Wheeling Statutes." If the Metropolitan Water District prevailed in the first phase of the trial, the second phase would consider "the reasonableness of the dollar amount of [the Metropolitan Water District's] wheeling rates, and any other remaining issues . . . ." However, the trial court found against the Metropolitan Water District in the first phase of the trial. Therefore, it never reached the issues which would be considered in the second phase. No hearing has been held to date wherein the Metropolitan Water District's wheeling rate has been examined as provided for in section 1813.

As a factual matter, the trial court found the Metropolitan Water District's wheeling rate of $141 per acre-foot included "costs for incentive payments for local conservation, and water supply development programs, as well as charges for water distribution, including charges for pipelines, aqueducts, and transportation of State Water Project water." The court further described the wheeling rate as including "such costs as [the Metropolitan Water District's] State Water Project supply costs, conservation incentive payments and fixed portions of its other 'capital' costs that are not directly related to an individual wheeling transaction. Some of those costs are fixed costs [the

---

[16]Defendants point to the deposition testimony of Brian Gordon Thomas, the Metropolitan Water District's assistant director of planning and resources. Mr. Thomas testified the wheeling rates at issue (the firm *and* nonfirm rates) would apply to transactions where a third party wants to wheel water to a member agency and where a member agency proposes to wheel water to a third party. Mr. Thomas stated, "I think that to the extent that you are utilizing Metropolitan's facilities and this is having impact on our system and impact on our other agencies in terms of either revenues or costs, that these rates could apply."

Metropolitan Water District] must pay regardless of whether any wheeling transactions take place."

Citing the language of the Wheeling Statutes, the trial court concluded: the Legislature intended that the owner of a water conveyance system recover incremental or additional capital, operation, maintenance, and replacement costs brought about by or attributable to a particular transaction; it was inconsistent with the purpose of the statute to allow owners of conveyance systems to recover all of their costs of doing business as a water district, regardless of whether such outlays were related to a wheeling transaction; and "an owner of facilities is entitled to fair compensation for the increased costs necessitated by a transferor's use of its facilities and nothing more." The trial court further concluded: "[The Metropolitan Water District's] contractual supply payments for State Water Project water . . . are not costs incurred in connection with a proposed use of [its] facilities for a wheeling transaction. Likewise, conservation incentive payments are not incurred . . . in connection with or because of a proposed wheeling transaction." Additionally, the trial court concluded that by providing service which is interruptible for "any reason," the Metropolitan Water District offers a service that is less than that required by the Wheeling Statutes; under the Wheeling Statutes, any wheeling transaction may be interrupted in the case of an emergency only. Finally, the trial court found that the Legislature intended that determinations, including available capacity and fair compensation, be made on a case-by-case basis; therefore, the Metropolitan Water District could not set fixed or "postage stamp" rates in advance and without regard to a particular wheeling transaction.

III. DISCUSSION

A. *The Wheeling Rate*

1. *Standard of Review*

■ This case presents questions of statutory interpretation. The application of the Wheeling Statutes to undisputed facts presents a question of law. (*International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611-612 [38 Cal.Rptr.2d 150, 888 P.2d 1279]; *Southern California Edison Co. v. State Board of Equalization* (1972) 7 Cal.3d 652, 659, fn. 8 [102 Cal.Rptr. 766, 498 P.2d 1014]; *Souza v. Lauppe* (1997) 59 Cal.App.4th 865, 871 [69 Cal.Rptr.2d 494].) We are not bound by the trial court's legal conclusions. (*Souza v. Lauppe, supra*, 59 Cal.App.4th at p. 871; *Harbor Fumigation, Inc. v. County of San Diego Air Pollution Control Dist.* (1996) 43 Cal.App.4th 854, 859 [50 Cal.Rptr.2d 874].)

■ The rules governing the construction of words in a statute are well settled. Our Supreme Court has held: "When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent. [Citation.]" (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148, 863 P.2d 218]; *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 724 [80 Cal.Rptr.2d 506, 968 P.2d 65].) Further, our Supreme Court has noted: "[The] words used . . . 'should be given the meaning they bear in ordinary use.' [Citations.]" "If the language is 'clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . .'" (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) We must give the words used "their 'usual and ordinary meaning.' [Citation.]" (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313]; *Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) However, the literal meaning of a statute must be in accord with its purpose as our Supreme Court noted in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659 [25 Cal.Rptr.2d 109, 863 P.2d 179]: "We are not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute] . . . .'" In *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299], our Supreme Court added: "The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in light of the statutory scheme [citation] . . . ." The Supreme Court has held: " 'The courts must give statutes a reasonable construction which conforms to the apparent purpose and intention of the lawmakers.' (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813 [114 Cal.Rptr. 577, 523 P.2d 617].)" (*Webster v. Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].) ■ Further, the Supreme Court has held: "We have recognized that a wide variety of factors may illuminate the legislative design, ' "such as context, the object in view, the evils to be remedied, the history of the time and of legislation upon the same subject,

public policy and contemporaneous construction." ' (*In re Marriage of Bouquet* [(1976)] 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371], quoting *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].)" (*Walters v. Weed* (1988) 45 Cal.3d 1, 10 [246 Cal.Rptr. 5, 752 P.2d 443]; *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [87 Cal.Rptr.2d 222, 980 P.2d 927].) ■ Finally, and this tenet of statutory construction will be of some importance as will be noted later: " 'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' (*Ford Motor Co.* v. *County of Tulare* (1983) 145 Cal.App.3d 688, 691 [193 Cal.Rptr. 511]; see generally 2A Sutherland, Statutory Construction (4th ed. 1984 rev.) § 47.23, p. 194.)" (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [257 Cal.Rptr. 708, 771 P.2d 406].) The construction of the Wheeling Statutes by the Metropolitan Water District is entitled to great weight and respect, subject of course to the ultimate duty to interpret the law which rests with the judicial branch of government. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2].)

■ If statutory language is unclear, or terms used are not specifically defined, a court may also consider evidence of legislative history in ascertaining the statute's meaning. (*White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 572; *Calvillo-Silva v. Home Grocery, supra,* 19 Cal.4th at p. 724; *Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152 [69 Cal.Rptr.2d 329, 947 P.2d 291]; *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 659 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) However, a court will generally consider only those materials indicative of the intent of the Legislature *as a whole.* Relevant material includes: legislative committee reports (*Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236, 763 P.2d 1326]); Legislative Analyst's reports (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 300 [250 Cal.Rptr. 116, 758 P.2d 58]); and testimony or argument to either a house of the Legislature or one of its committees. (*People v. Patterson* (1999) 72 Cal.App.4th 438, 443 [84 Cal.Rptr.2d 870]; *McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161, fn. 3 [69 Cal.Rptr.2d 692].) Those materials may be considered because, as the Supreme Court explained in *Hutnick v. United States Fidelity & Guaranty Co., supra,* 47 Cal.3d at page 465, footnote 7, "[I]t is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials

therefore provide some indication of how the measure was understood at the time by those who voted to enact it." Material showing the motive or understanding of an individual legislator, including the bill's author, his or her staff, or other interested persons, is generally not considered. (*Calvillo-Silva v. Home Grocery, supra,* 19 Cal.4th at pp. 726-727; *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057]; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 569 [20 Cal.Rptr.2d 341, 853 P.2d 507].) This is because such materials are generally not evidence of the Legislature's *collective* intent. (*Williams v. Garcetti, supra,* 5 Cal.4th at p. 569; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 701 [170 Cal.Rptr. 817, 621 P.2d 856].) For the same reason, letters to various legislators and to the Governor expressing opinions in support of or opposition to a bill (*Quintano v. Mercury Casualty Co., supra,* 11 Cal.4th at p. 1062, fn. 5), press releases by a bill's author (*Calvillo-Silva v. Home Grocery, supra,* 19 Cal.4th at pp. 726-727), and enrolled bill reports (*People v. Patterson, supra,* 72 Cal.App.4th at p. 444; *McDowell v. Watson, supra,* 59 Cal.App.4th at p. 1162, fn. 3) generally should not be considered.[17]

### 2. *System-wide Costs*

■ We first consider whether as a matter of law the Wheeling Statutes prevent the Metropolitan Water District from including system-wide costs in calculating its wheeling rate. Stated differently, the question is whether as a matter of law the Wheeling Statutes mandate that a water conveyance facility owner recover reasonable capital, operation, and maintenance costs incurred only with respect to the particular facilities used in the wheeling transaction. The parties refer to this concept as a "point-to-point" calculation.

---

[17]The San Diego County Water Authority and the Imperial Irrigation District separately filed requests for judicial notice of legislative history of the Wheeling Statutes. The Metropolitan Water District opposed the requests. For the reasons discussed above, we agree with the Metropolitan Water District's opposition to the judicial notice requests *except* with respect to the Imperial Irrigation District's exhibit No. 1, pages 19-20 (Assem. Com. on Water, Parks and Wildlife, Republican analysis of Assem. Bill No. 2746 (1985-1986 Reg. Sess.) as amended Aug. 11, 1986). We deny the San Diego County Water Authority's request for judicial notice as to exhibits Nos. 131 (letter to bill's author), 132 (Assem. Katz Fact Sheet dated Apr. 14, 1986), 134 (unidentified proposed amendments to Assem. Bill No. 2746), and 148 (enrolled bill report). We deny the Imperial Irrigation District's judicial notice request as to exhibit No. 1, pages 2 (letter from bill's author to Governor after enrollment), and 4-15 (enrolled bill reports), and exhibit No. 2, pages 22-25 (letter). No party has objected to our considering as part of the legislative history analyses of Assembly Bill No. 2746 by the state Department of Water Resources. Those analyses were found in the legislative bill file of the Assembly Republican Caucus on Assembly Bill No. 2746 and the legislative bill file of the Office of Senate Floor Analyses on Assembly Bill No. 2746.

Defendants do not dispute that the Metropolitan Water District may include in a wheeling charge its reasonable capital, operation, and maintenance costs associated with the use of its facilities to transport water in a wheeling transaction. They take issue with the notion that the Metropolitan Water District may charge member agencies that wheel water for a share of the capital, operation, or maintenance costs of the *entire* water conveyance system, including portions not used in a particular wheeling transaction. Instead, they assert, a wheeling charge for a particular transaction must be calculated with respect to the point-to-point use of the facilities. Defendants also argue that certain system-wide costs are not specifically related to wheeling transactions. Among the system-wide charges that defendants argue should not be· included in the wheeling fee are debt service, State Water Project contract outlays, and water conservation program expenses. Defendants reason these costs are not incurred by the Metropolitan Water District because of a member agency's specific wheeling transaction. Defendants further note that the Metropolitan Water District is subject to those costs whether a member agency wheels water or not.

The Metropolitan Water District argues in part that because it recovers its capital, operation, and maintenance costs primarily through the sale of water to member agencies, a wheeling transaction that *displaces a sale* of water to a member agency causes it to become liable for the outlays otherwise recoverable in a sale. The Metropolitan Water District argues that a portion of its capital investment and other system-wide costs are incurred by it *because* the wheeling transaction displaces a sale to a member agency. The Metropolitan Water District contends that by setting its member agency wheeling rate on a par with purchased-water rates, it is recovering the reasonable charges it incurs in the transmission of wheeled water, as permitted by the Wheeling Statutes; therefore, the trial court erred in ruling the Metropolitan Water District could not include capital investment and system-wide costs in calculating its wheeling rate.

As noted above, there is some dispute whether the Metropolitan Water District's wheeling rate would apply *only* to member agency transactions that result in a lost sale of water by the Metropolitan Water District to that member agency. In any event, we find neither the plain language of the Wheeling Statutes nor the legislative history supports a conclusion *as a matter of law* that system-wide costs cannot under any circumstances be included in a wheeling rate calculation.

As mandated by the Supreme Court, we look first to the statutory language. (*White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 572; *Calvillo-Silva v.*

*Home Grocery, supra,* 19 Cal.4th at p. 724; *Freedom Newspapers, Inc. v. Orange County Employees Retirement System, supra,* 6 Cal.4th at p. 826.) Under the plain terms of the Wheeling Statutes, a water conveyance system owner is entitled to fair compensation "for that use," i.e., "the use of a water conveyance facility which has unused capacity, for the period of time for which that capacity is available . . . ." (§ 1810.) Fair compensation is defined as "the reasonable charges *incurred* by the owner of the conveyance system, *including* capital, operation, maintenance, and replacement costs, *increased costs* from any *necessitated* purchase of supplemental power, and including reasonable credit for any offsetting benefits for the use of the conveyance system." (§ 1811, subd. (c), italics added.) "Replacement costs" are further and specifically defined as *"the reasonable portion of costs associated with material acquisition* for the correction of irreparable wear or other deterioration of conveyance facility parts that have an anticipated life that is less than the conveyance facility repayment period and which costs are *attributable to the proposed use.*" (§ 1811, subd. (d), italics added.) The water conveyance facility owner, in this case the Metropolitan Water District, is specifically authorized to determine what is "fair compensation" provided the determination is made in a timely and reasonable manner "consistent with the requirements of law to facilitate the voluntary sale, lease, or exchange of water . . . ." (§ 1813.)

Several observations about the language of the statutes support our conclusion that the Wheeling Statutes do not as a matter of law preclude under any and all circumstances including system-wide costs in a wheeling rate calculation. First, the Legislature did not utilize language which is consistent with defendants' theory that only point-to-point costs may be recovered. Rather, the Legislature has chosen words which convey a materially broader right of compensation on the part of the water system operator, in this case, the Metropolitan Water District. In section 1811, subdivision (c) the right of "[f]air compensation" includes "reasonable charges incurred by the owner of the conveyance system, including capital, operation, maintenance, and replacement costs, increased costs from any necessitated purchase of supplemental power, and including reasonable credit for any offsetting benefits *for the use of the conveyance system.*" (Italics added.) Section 1811, subdivision (c) makes no reference to point-to-point costs or any similar concepts. In similar vein, section 1811, subdivision (c) makes no reference to actual, increased, incremental, or marginal expenditures in terms of "capital, operation, [and] maintenance . . . costs." No doubt, in terms of "replacement costs" listed in section 1811, subdivision (c), the Legislature has more narrowly defined that term. In section 1811, subdivision (d), the Legislature has stated that "replacement costs" are limited to those which are "attributable to the proposed use." Nonetheless, in terms of "capital, operation, [and]

maintenance . . . costs" in section 1811, subdivision (c), no such limiting language appears; rather, other than in connection with "replacement costs" as limited in section 1811, subdivision (d), the water system operator is entitled to fair compensation "for the use of the conveyance system."

The Imperial Irrigation District argues it would be illogical to conclude that the Legislature intended to limit only replacement and power charges to increased costs attributable to or necessitated by a proposed wheeling use of a water conveyance facility. It asserts in part, "Includable capital costs may be calculated by either an incremental method or a proportionate (pro rata) method, so long as the capital expenses are related to the transferred water." We conclude that if the Legislature wanted to limit recoverable "capital, operation, [and] maintenance . . . costs" (§ 1811, subd. (c)) to actual, incremental, increased, or point-to-point expenses it would have said so. (Cf. *In re Marriage of Damico* (1994) 7 Cal.4th 673, 679-680 [29 Cal.Rptr.2d 787, 872 P.2d 126]; *Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 725.) We should not, as the Imperial Irrigation District proposes, engraft the statutory limitations on recoverable replacement costs in subdivision (d) of section 1811 onto the reference to "capital, operation, [and] maintenance" costs in subdivision (c) of that section. To so limit includable capital, operation, and maintenance costs would be inconsistent with the plain language of the statute. (*Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 725.) Moreover, the Supreme Court has made it clear that when the Legislature has carefully omitted language in one part of a statute, it should not be implied where it has been excluded. (*Ibid.; People v. Rodriguez* (1999) 69 Cal.App.4th 341, 349-350 [81 Cal.Rptr.2d 567]; *In re Dylan T.* (1998) 65 Cal.App.4th 765, 774 [76 Cal.Rptr.2d 684].)

Defendants argue the Legislature has declared that recoverable wheeling costs must be determined solely by reference to the distance water travels and the particular facilities through which it moves. As articulated by the San Diego County Water Authority, there must be a "nexus . . . between the wheeling rate charged and the actual path-specific facilities used in conveying water." In support of their position, defendants point primarily to the language "for that use" in section 1810. The Imperial Irrigation District argues "for that use" (§ 1810) means recoverable expenses must be "associated with moving water," "related to conveyance," or limited to actual costs. However, the phrase at issue in section 1810 states "if fair compensation is paid for that use." As noted previously, "[f]air compensation" is defined in section 1811, subdivision (c). No doubt, there are limitations on "replacement costs" as set forth in section 1811, subdivision (d). However, there are no similar limitations on recoverable "capital, operation, [and] maintenance

. . . costs" set forth in section 1811, subdivision (c). Further, as noted previously, section 1811, subdivision (c) indicates that "[f]air compensation" is defined as "reasonable charges . . . including capital, operation, maintenance, and replacement costs . . . for the use of the conveyance system." The flaw in the argument of the Imperial Irrigation District is that it: incorrectly focuses solely upon the "for that use" language appearing in section 1810; omits consideration of the "fair compensation" language in the same phrase; and disregards the scope of the definition of "[f]air compensation" in section 1811, subdivision (c). Needless to note, in assessing legislative intent, we must construe the relevant statutes as a whole. (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [87 Cal.Rptr.2d 222, 980 P.2d 927]; *California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d at p. 18.)

Further, as discussed above, had the Legislature intended to limit recoverable capital, operation, and maintenance costs to actual costs, it would have used specific language to that effect. (Cf. *In re Marriage of Damico, supra,* 7 Cal.4th at pp. 679-680; *Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 725.) Had the Legislature intended to exclude any portion of capital, operation, or maintenance costs associated with the conveyance system as a whole, it could have used qualifying language to that effect. (*In re Marriage of Damico, supra,* 7 Cal.4th at pp. 679-680; *Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 725.) In addition, we reject defendants' arguments that recoverable capital costs are limited to *increased* capital expenditures necessitated by a wheeling use such as the addition of a pump or new piping or a turnout to a pipeline. Contrary to defendants' assertions, the specifically authorized recovery of capital costs is not limited to *additional* capital expenditures for *changes* in the conveyance system to meet the needs of a particular wheeling transaction. The Metropolitan Water District is under no statutory mandate to add to or reconstruct its facilities to accommodate wheeling transfers. The Metropolitan Water District is required only to make a statutorily defined amount of its unused capacity in its existing system available for wheeling in compliance with the Wheeling Statutes.

Second, a water conveyance system owner is entitled to reasonable charges it *incurs* "for the use of the conveyance system" (§ 1811, subd. (c)) when there is unused capacity available. The statutory reference to capital, operation, and maintenance costs is modified by the language "reasonable charges *incurred* by the owner of the conveyance system . . . for the use of the conveyance system." (*Ibid.,* italics added.) We must give the word "incurred" its usual and ordinary meaning. (*White v. Ultramar, Inc., supra,*

21 Cal.4th at p. 572; *People v. Loeun, supra,* 17 Cal.4th at p. 9; *Phelps v. Stostad, supra,* 16 Cal.4th at p. 32.) The usual and ordinary meaning of "incurred" is "to become liable or subject to," brought about by, occasioned, or caused. (Webster's Collegiate Dict. (10th ed. 1995) p. 590; Statsky, West's Legal Thesaurus/Dict. (1985) p. 398; Black's Law Dict. (6th ed. 1990) p. 768, col. 1.) "Charges incurred" refers to costs a person becomes subject to or liable for because of an act or transaction. (See, e.g., *Hughes v. Mid-Century Ins. Co.* (1995) 38 Cal.App.4th 1176, 1182, fn. 7 [45 Cal.Rptr.2d 302]; *Hertzka & Knowles v. Salter* (1970) 6 Cal.App.3d 325, 332 [86 Cal.Rptr. 23]; *Weinberg Co. v. Heller* (1925) 73 Cal.App. 769, 780 [239 P. 358].) Hence, the "fair compensation" (§ 1810) to which a water conveyance system owner is entitled for wheeling water includes reasonable capital, maintenance, and operation costs occasioned, caused, or brought about by "the use of the conveyance system." (§ 1811, subd. (c).) "[F]air compensation" (§ 1810) includes charges the owner, in this case the Metropolitan Water District, becomes subject to or liable for in using the "conveyance system" (§ 1811, subd. (c)) to wheel water when it has unused capacity.

The San Diego County Water Authority asserts it would be "illogical and unreasonable" to allow the Metropolitan Water District to pass past costs on to "present users " "[s]ince no present transferor had any role in causing [the Metropolitan Water District] to incur those past costs . . . ." The argument is somewhat unclear. However, the "present users" in question are member agencies of the Metropolitan Water District, to whom the wheeling rate applies. Moreover, those member agencies as such did have a role in "causing" the Metropolitan Water District, through its board of directors, to incur the costs of developing the infrastructure that serves the member agencies; an infrastructure that is utilized in wheeling water.

Third, the Legislature specifically authorized a water conveyance system owner to determine what is "fair compensation" (§ 1810) subject to certain provisions. As noted above, section 1812 provides that "[t]he state, regional, or local public agency owning the water conveyance facility shall in a timely manner determine . . . [¶] . . . [¶] . . . fair compensation." The Legislature did not enact a fair compensation *calculation formula.* Contrary to the assertions of the San Diego County Water Authority and the CPIL, the Legislature did not enact any language requiring that wheeling transfers be accomplished "at the lowest possible charge."

To the extent the statutory language is unclear, and because the Legislature did not specifically define "capital, operation, [and] maintenance" costs in section 1811, subdivision (c), we turn next to the legislative history. The

legislative history does not support defendants' position that, as a matter of law, the Metropolitan Water District may not set a wheeling rate that includes system-wide costs. Not a single sentence in any report reveals a legislative intention to bar the Metropolitan Water District from doing what it did in this case. (*White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 572; *Calvillo-Silva v. Home Grocery, supra,* 19 Cal.4th at p. 724; *Pacific Gas & Electric Co. v. County of Stanislaus, supra,* 16 Cal.4th at p. 1152; *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist., supra,* 14 Cal.4th at p. 659.) The compensatory language of the Wheeling Statutes was repeatedly amended and, with respect to capital, operation, and maintenance costs, expanded, in response to concerns expressed by water entities in opposition to the bill. Opponents of Assembly Bill No. 2746 argued: water conveyance system owners should be able to determine fair compensation; fair compensation should not be less than the use charge to long term contractors being served by the facility, and the definition should be expanded to so allow; if a wheeler paid only marginal costs, it could pay much less than the long term contractors who helped finance the facility, therefore, the definition of fair compensation should focus on a pro rata share of capital and other costs; the bill could interfere with water conveyance system owners' ability to meet contract payments if wheelers undercut prices and stole away customers; water rates to consumers who do not benefit from a wheeling transfer could increase; and because water districts have fixed costs, and if wheeling transactions resulted in any lost sales, increased rates or taxes could result for the remaining customers. In an unmistakable response to those concerns, and in an effort to gain the support of water entities, the Legislature amended the bill to: expand the fair compensation definition to include capital as well as operation and maintenance costs; omit references to marginal, pro rata, and incremental capital, operation, or maintenance costs in favor of a broader reference to reasonable such charges incurred; and to give water conveyance system owners control over the fair compensation determination.

The Legislature's goal was to remove institutional barriers to wheeling transactions. As revealed by the legislative history, enactment of the Wheeling Statutes was prompted by a concern that water conveyance facility owners would deny access to their systems or engage in protracted negotiations concerning wheeling uses. Contrary to defendants' assertions, there is no evidence the Legislature acted out of a concern that water conveyance facility owners in general, or the Metropolitan Water District in particular, were blocking wheeling transactions by "demanding unreasonable prices for access." Nor is there any support in the legislative history for the San Diego County Water Authority's claim that "the Legislature chose to pursue a

market-based approach that allowed buyers and sellers to determine the price of water and limit the ability of facility owners to block transfers through barrier pricing." Rather, the legislative history shows that, consistent with state policy to facilitate the voluntary sale of water, the Legislature's aim was simply to *require* water conveyance system owners to make unused capacity in their facilities available for wheeling transfers. The Legislature recognized that in return for making its facilities available, a water conveyance system owner should be reasonably compensated for the use of the system. There is no indication the Legislature ever intended that the water conveyance system owner should suffer potential or actual financial loss as a result. Rather, the Legislature took repeated steps to enact compensatory language that would enable water conveyance system owners to provide the desired wheeling service while recovering their costs. In short, the Legislature did not intend that the impact of the Wheeling Statutes should be to cause a water conveyance system owner to lose money or to subsidize wheeling transfers. Moreover, no legislative report contains a single paragraph, sentence, or clause which suggests in any fashion that system-wide costs could not be assessed. In other words, there is no admissible historical evidence the Legislature intended that reasonable system-wide costs could not under any circumstances be considered in developing a wheeling transaction fee. Whether the system-wide costs included in the Metropolitan Water District's wheeling rate are proper must be determined in a hearing conducted pursuant to section 1813 upon issuance of the remittitur.

### 3. *Fixed Nature of Rate*

■ Defendants contend the Wheeling Statutes mandate that the Metropolitan Water District determine its wheeling rates on a case-by-case basis as transactions are proposed. We disagree. We turn again to the language of the statutes. (*White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 572; *Calvillo-Silva v. Home Grocery, supra,* 19 Cal.4th at p. 724; *Freedom Newspapers, Inc. v. Orange County Employees Retirement System, supra,* 6 Cal.4th at p. 826.) As noted above, the Wheeling Statutes grant the water conveyance system owner the authority to determine fair compensation. As noted previously, section 1812 provides: "The state, regional, or local public agency owning the water conveyance facility shall *in a timely manner* determine the following: [¶] (a) The amount and availability of unused capacity. [¶] (b) The terms and conditions, including operation and maintenance requirements and scheduling, quality requirements, term or use, priorities, and *fair compensation.*" (Italics added.) Section 1813 states: "In making the determinations required by this article, the respective public agency shall act in a *reasonable* manner *consistent with the requirements of law to facilitate the voluntary sale,*

*lease, or exchange of water* and shall support its determinations by written findings. In any judicial action challenging any determination made under this article the court shall consider all relevant evidence, and the court shall give due consideration to the purposes and policies of this article. In any such case the court shall sustain the determination of the public agency if it finds that the determination is supported by substantial evidence." (Italics added.)

Under the plain terms of sections 1812 and 1813, the Metropolitan Water District is authorized (indeed, required) to determine fair compensation. The statutory authorization is limited by the requirements that the fair compensation determination be accomplished in a "timely" and "reasonable" manner, "consistent with the requirements of law to facilitate the voluntary sale, lease, or exchange of water . . . ." (§ 1813.) In addition, the Metropolitan Water District must "support its determinations by written findings." (§ 1813.) The wheeling statutes are silent on the question whether a rate may be set in advance of a specific wheeling proposal.

The Imperial Irrigation District asserts that "the 'timely' rate-setting referenced in section 1812 is a requirement of timeliness for a response after a request has been made." The Imperial Irrigation District argues the language "timely" can *only* mean after an application by a bona fide transferor. We disagree. Neither the statutory language nor anything in the legislative history requires that the word "timely" be so construed. To the contrary, we conclude it cannot reasonably be argued that determining a fixed rate for wheeling by member agencies in advance of a particular transaction violates the timeliness requirement of section 1812. As evidenced by the legislative history, one impetus for the enactment of the Wheeling Statutes was the tendency of water conveyance system owners to engage in protracted negotiations of wheeling proposals. The requirement that the fair compensation determination be accomplished in a "timely" manner addressed that problem. The Metropolitan Water District's application of its fixed rate facilitates a timely determination of fair compensation. It simplifies the factors to be considered in setting the rate for a particular transaction. The Metropolitan Water District need only modify the fixed rate as applied to a proposed wheeling transaction after considering any necessitated power costs, treatment costs, replacement costs, or offsetting benefits. Application of the fixed rate limits the scope of any negotiations. It is entirely consistent with the timeliness mandate. Moreover, we find no other language in the Wheeling Statutes that precludes the adoption of a fixed wheeling rate. Further, there is no evidence the Legislature ever specifically intended that fixed wheeling rates were not to be applied so long as they required the payment of fair compensation.

### 4. *Interruption of Service*

The Metropolitan Water District reserved the right to interrupt wheeling service to a member agency "for any reason, including operational needs, water quality needs, changes in customer demands, maintenance requirements, or other similar conditions." Subdivision (c) of section 1810 provides: "Any person or public agency that has a water service contract with or the right to receive water from the owner of the conveyance facility who has an emergency need may utilize the unused capacity that was made available pursuant to this section for the duration of the emergency." "Emergency" is defined in section 1811, subdivision (b), as "a sudden occurrence such as a storm, flood, fire, or an unexpected equipment outage impairing the ability of a person or public agency to make water deliveries." The Imperial Irrigation District argues the Metropolitan Water District's interruption of service provision "would eliminate any necessity for [the] emergency exception" in section 1810, subdivision (c).

The statutory language on which the Imperial Irrigation District relies does not by its clear and unambiguous terms address *the Metropolitan Water District's* ability to interrupt wheeling service. Rather, sections 1810, subdivision (c), and 1811, subdivision (b), govern *a member agency's* right to interrupt a wheeling transaction in the event of an emergency. Section 1810, subdivision (c), specifically provides that "[a]ny person or public agency that has a water service contract with or the right to receive water from the owner of the conveyance facility" may interrupt a wheeling transaction in the event of an emergency. The subdivision by its unambiguous terms does not govern the Metropolitan Water District's ability to interrupt a wheeling transaction. Therefore, we reject the Imperial Irrigation District's argument. We note that under section 1812, the Metropolitan Water District is authorized to determine, with respect to a wheeling use, "[t]he terms and conditions, including operation and maintenance requirements and scheduling, quality requirements, term or use, [and] priorities . . . ." Of course, the Metropolitan Water District may not under the guise of "interrupting" a wheeling transaction, simply refuse to wheel water. It does not contend otherwise. We emphasize that defendants may challenge the interruption of service provisions pursuant to section 1813. On remand, the trial court may consider whether the Metropolitan Water District's interruption of service provision is consistent with sections 1812 and 1813.

### 5. *Other Issues*

Defendants contend the Metropolitan Water District's wheeling rate is so high that it will discourage rather than facilitate wheeling transfers by

member agencies. Moreover, they assert, the rate violates the statutory requirement that in making its fair compensation determination, the Metropolitan Water District "act in a reasonable manner consistent with the requirements of law *to facilitate the voluntary sale, lease, or exchange of water . . . .*" (§ 1813, italics added.) Defendants further argue the judgment must be upheld because the Metropolitan Water District improperly included certain specified costs in calculating the wheeling rate at issue. The Imperial Irrigation District contends the Metropolitan Water District has included system-wide replacement costs in its wheeling rate without regard to the statutory mandate that recoverable replacement costs are limited to those "attributable to the proposed use." (§ 1811, subd. (d).) Whether the Metropolitan Water District properly included specific costs in its wheeling rate calculation or has adopted a rate that violates the statutory mandate to facilitate wheeling, are questions that were not reached in the trial court. The second phase of the bifurcated trial was to be devoted to all issues other than whether as a matter of law the Wheeling Statutes precluded adoption of a fixed rate that included system-wide costs. The second phase of the trial never occurred. The trial court, on remand, in compliance with section 1813, is free to consider the parties' contentions beyond those identified as at issue in the first phase of the bifurcated trial. We leave these issues in the good hands of the trial court. We have, with respect, disagreed with certain of the trial court's legal conclusions; but we have no doubt as to its readiness and ability to promptly and fairly resolve the phase two issues on remand in full compliance with section 1813.

## B.  *Attorney's Fees and Costs*

The parties have also appealed from the trial court's postjudgment order variously awarding and denying costs and attorney's fees. Our reversal of the judgment in favor of defendants requires we vacate the attorney fee and cost award in their favor. Accordingly, the postjudgment order will be reversed. (*Casey v. Overhead Door Corp.* (1999) 74 Cal.App.4th 112, 124 [87 Cal.Rptr.2d 603] ["Since we reverse the judgment upon which the fees and costs were awarded, we must also reverse the judgment for fees and costs. [Citation.]"]; *Southern Pacific Transportation Co. v. Mendez Trucking, Inc.* (1998) 66 Cal.App.4th 691, 696 [78 Cal.Rptr.2d 236] ["Since we reverse the judgment below, respondent is no longer the prevailing party, and thus not entitled to attorney fees pursuant to Civil Code section 1717."]; *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 693 [74 Cal.Rptr.2d 497] ["Accordingly, we hold that the court erred in ordering the issuance of a peremptory writ of mandate, and the award of attorneys' fees under Code of Civil Procedure section 1021.5 is therefore also reversed."]; *Department of Industrial Relations v. UI Video Stores, Inc.* (1997)

55 Cal.App.4th 1084, 1096-1097 [64 Cal.Rptr.2d 457] ["Because it is based on the judgment favoring Blockbuster, the award of attorney fees and costs to Blockbuster must be reversed along with the judgment."]; *Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 984 [63 Cal.Rptr.2d 244] ["Because we will reverse the judgment vacating the negative declaration and requiring an EIR, the Silveiras did not prevail under Code of Civil Procedure section 1021.5 and are not entitled to attorneys' fees."]; *Department of Industrial Relations v. Nielsen Construction Co.* (1996) 51 Cal.App.4th 1016, 1031 [59 Cal.Rptr.2d 785] ["In light of our reversal of the summary judgment, the order awarding attorney fees is also reversed."]; *Cutujian v. Benedict Hills Estates Assn.* (1996) 41 Cal.App.4th 1379, 1390 [49 Cal.Rptr.2d 166] ["In view of our reversal of the judgment, the order awarding attorney fees must also be reversed."].)

## IV. DISPOSITION

The judgment is reversed. The Metropolitan Water District of Southern California is to recover its costs on appeal, jointly and severally, from the San Diego County Water Authority, the Imperial Irrigation District, the Chemehuevi Indian Tribe, the Quechan Indian Tribe, Cadiz Inc. (previously Cadiz Land Company, Inc.), and the Center for Public Interest Law. The postjudgment attorney's fees and costs order is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

Godoy Perez, J., and Weisman, J.,* concurred.

Petitions for a rehearing was denied June 15, 2000, and June 23, 2000, and on June 15, 2000, the opinion was modified to read as printed above. The petitions of defendants and appellants and respondent Center for Public Interest Law for review by the Supreme Court was denied September 13, 2000. Mosk, J., and Kennard, J., were of the opinion that the petitions should be granted.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.