[No. A082685. First Dist., Div. Two. May 17, 1999.]

HAYWARD AREA PLANNING ASSOCIATION, INC., et al., Plaintiffs and Appellants, v.
ALAMEDA COUNTY TRANSPORTATION AUTHORITY et al., Defendants and Respondents.

98

**COUNSEL**

Stuart M. Flashman for Plaintiff and Appellant Hayward Area Planning Association, Inc.

H. E. Christian Peeples for Plaintiff and Appellant Citizens for Alternative Transportation Solutions.

Wendel, Rosen, Black & Dean and Les A. Hausrath for Defendant and Respondent Alameda County Transportation Authority.

William M. McMillan; Daniel C. Murphy; Donald M. Velasco; Antonio R. Anziano; and Susan A. Dovi for Defendant and Respondent California Department of Transportation.

**OPINION**

**RUVOLO, J.—**

## I.

### INTRODUCTION

Appellants Hayward Area Planning Association, Inc., and Citizens for Alternative Transportation Solutions appeal from the judgment entered after the trial court granted summary judgment to respondents Alameda County Transportation Authority (ACTA) and the California Department of Transportation (Caltrans). Appellants brought the underlying action contending respondents violated provisions of the Bay Area County Traffic and Transportation Funding Act (Pub. Util. Code, § 131000 et seq.)[1] by using revenue generated from a voter-approved sales and use tax to implement a highway extension project that contains a route or alignment significantly different from the one presented to the voters. Respondents were granted summary

---

[1]The Bay Area County Traffic and Transportation Funding Act will be simply referred to as "the Act." Furthermore, all undesignated statutory section references are to the Public Utilities Code.

judgment based on the argument that the voters do not have the right to determine the particular alignment or route for state highways; instead, that authority is exclusively within the jurisdiction of Caltrans. After examining the language and legislative history of the Act, as well as the ballot language submitted to the voters, we find this rationale insufficient to justify a departure from the unambiguous language used in the Act. Instead, we conclude that when funds are generated pursuant to the Act for the purpose of implementing a particularly described transportation project, these funds cannot be diverted and applied to implement a route significantly different from that which was described to the voters without opportunity for public comment and participation in the amendment process. This holding compels reversal of the summary judgment granted respondents.

## II.

### FACTS

The Act was adopted in 1986 after the Legislature found that the Bay Area was experiencing "serious traffic congestion and transit mobility problems that threaten the economic viability of the area and adversely impact the quality of life therein." (§ 131001, subd. (a).) The Legislature addressed this problem by establishing a framework whereby "the counties and cities within the nine-county San Francisco Bay area"[2] could "collectively develop and implement, on a county-by-county basis, near-term local traffic and transportation projects that responsibly and adequately deal with current and anticipated traffic congestion and transit mobility problems." (§ 131001, subd. (c).) To this end, the Act authorized the voters in each of the designated Bay Area counties to create a "county transportation authority" in order to "implement a retail transactions and use tax for the purpose of funding a local transportation expenditure plan . . . ." (§ 131001, subd. (e).)[3]

The key element of the "county transportation expenditure plan," as described by the Act, is a "list of essential traffic and transportation projects in the order of priority within the county, . . . which current estimates of federal, state, and local funds indicate are insufficient to provide for their completion." (§ 131051, subd. (a)(1).) The recommended county transportation expenditure plan then undergoes an adoption and approval process. This

---

[2]The designated counties in the San Francisco Bay Area are Alameda, Contra Costa, Marin, Napa, Sonoma, Solano, San Francisco, San Mateo and Santa Clara. (See § 131009.)

[3]In the alternative, the voters could authorize the Metropolitan Transportation Commission to perform this function. (§ 131001, subd. (e).)

process includes: 1) review and approval by the expenditure plan advisory committee, if any (§ 131050); 2) public hearings before, and review and approval by, the Metropolitan Transportation Commission (§§ 131052-131054); 3) approval by a majority of the county board of supervisors; and 4) approval by majority votes of the respective city councils of cities representing a majority of the population in the county's incorporated areas. (§ 131055).

Once this process has been completed, an ordinance imposing a retail transactions and use tax at a rate not to exceed 1 percent is submitted to the voters for their approval.[4] (§§ 131052; 131053; 131055; 131102, subd. (a).) The entire adopted county transportation expenditure plan must be included in the voter information handbook. (§ 131108, subd. (h).) The Act provides "[a]ll allocations of revenues derived from the adoption of a retail transactions and use tax ordinance in a county shall be consistent with the priorities established by its county transportation expenditure plan." (§ 131101.)

The Act also specifies the procedure to be used to amend the county transportation expenditure plan after the voters have approved it. That procedure requires that any "amendment which adds or deletes a project, or is of major significance," shall be submitted for approval in the same manner the adopted plan was adopted and approved, requiring significant public participation in the process. (§§ 131304, 131203.)

In 1986, in accordance with the above described statutory framework, Alameda County established the Alameda Countywide Transportation Committee (ACTC) to develop a county transportation expenditure plan and an associated countywide sales and use tax measure. In the November 1986 General Election, ACTC presented an ordinance to the voters of Alameda County denominated "Measure B." Measure B proposed creating respondent ACTA to administer a countywide retail sales/use tax at the rate of one-half of 1 percent to fund 11 transportation projects set forth in the "Alameda County Transportation Expenditure Plan" (the Expenditure Plan). We are concerned with only one of these projects, which proposed allocating $134 million from the anticipated tax revenues for what, in reality, were several projects collectively labeled "Route 238 and Route 84." One component of the Route 238 project was described in the ballot pamphlet for the November 1986 election as the construction of "a six-lane freeway/expressway along Foothill and Mission Boulevard" between the State Route 238/Interstate 580 interchange and Industrial Boulevard in Hayward, a

---

[4]The voters may also approve the issuance of bonds, payable from the proceeds of the retail transactions and use tax, for the purpose of financing the projects described in the adopted county transportation expenditure plan. (§ 131108.)

distance of approximately 5.4 miles. The accompanying location map was consistent with this description and showed a Foothill and Mission Boulevard alignment for the freeway/expressway. The map's text referred to an alignment "from Route 580 along Mission Boulevard" and indicated the "work will consist of constructing a six-lane freeway/expressway from Route 580 to Industrial Boulevard in Hayward, . . ." Alameda County voters approved Measure B in November 1986.

On July 30, 1997, appellants filed their petition for peremptory writ of mandate and complaint for injunctive relief. The gravamen of appellants' petition and complaint was their allegation that respondent ACTA violated provisions of the Act by "improperly and illegally" using Measure B tax funds in support of an alignment for the Route 238 project that differed from the route described to the voters in the November 1986 ballot information. Appellants alleged this discrepancy was purposeful. As claimed by appellants, "when the [Expenditure Plan] was approved by the ACTC, the ACTC made a conscious decision to describe the project as running along Foothill and Mission Boulevard, rather than showing an alignment through the Hayward Hills, in order to avoid disputes over environmentally sensitive land and thereby allay would-be opponents to the measure."

Appellants further alleged that since the 1986 adoption of Measure B, respondents had disavowed any intention of constructing the Route 238 project along the voter-approved Foothill and Mission Boulevard alignment, and instead, were moving forward with plans to use "Measure B tax funds towards the construction of the Hayward Bypass, a four/six lane expressway/ freeway that runs well east of Foothill and Mission Boulevard into the Hayward hills before descending again to Industrial Boulevard." Appellants claimed "that ACTA's use of Measure B tax funds towards construction of the Hayward Bypass Project violates the terms of Measure B and the associated Alameda County Transportation Expenditure Plan in that the text and maps of Measure B and the Expenditure Plan specifically called for the construction of Route 238 in Hayward, 'as a six lane freeway/expressway along Foothill and Mission Boulevard to Industrial Parkway.' " In light of this disparity, appellants' lawsuit contended that ACTA was acting without legal authority in "using funds collected under the Measure B tax for a purpose not authorized by that ballot measure," and in authorizing a "*de facto* amendment" to the Expenditure Plan without an opportunity for public comment and participation in the review and approval process, as statutorily required. (Original italics.) Appellants requested that the trial court grant injunctive relief to prevent respondents from spending Measure B tax funds "in support of the Hayward Bypass Project," and that the court order "restitution of all funds improperly spent."

Respondents moved the court for summary judgment. The court found respondents were entitled to judgment as a matter of law after concluding, in effect, that there was no triable issue of material fact raised in appellants' lawsuit. In so ruling, the trial court made two principal findings: 1) that the issues posed by appellants' lawsuit were premature and not ripe for adjudication; and 2) that appellants' action was substantively without merit because Streets and Highways Code section 90 grants Caltrans exclusive jurisdiction over route or alignment selection for state highways. We consider these issues in turn.

## III.

### A. *Ripeness of Controversy*

■ Respondents argue we should affirm the trial court's grant of summary judgment without reaching the merits of this controversy because this case is not "ripe" for judicial determination. They point out that until the environmental review and planning documents are finally approved and certified, no final decision regarding the alignment of the Route 238 project can or will be made. Respondents argue that because they have not yet undertaken final agency action on the disposition of the Route 238 project, appellants' lawsuit is premature.

■ The basic rationale of the ripeness doctrine is " 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' [Citation.]" (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 171 [188 Cal.Rptr. 104, 655 P.2d 306], quoting *Abbott Laboratories* v. *Gardner* (1967) 387 U.S. 136, 148-149 [87 S.Ct. 1507, 1515, 18 L.Ed.2d 681], italics omitted.) The legal issues posed must be framed with sufficient concreteness and immediacy so that the court can render a conclusive and definitive judgment rather than a purely advisory opinion based on hypothetical facts or speculative future events. (See *Pacific Legal Foundation* v. *California Coastal Com.*, *supra*, 33 Cal.3d at p. 171.) A controversy is "ripe" for judicial resolution when " 'it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]" (*Ibid.*, quoting *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 [61 Cal.Rptr. 618].)

We must construe the facts developed in the record most favorably to appellants, the parties who opposed the summary judgment. (*Amstone* v. *Peninsular Fire Ins. Co.* (1991) 226 Cal.App.3d 1019, 1022 [277 Cal.Rptr. 260].) So viewed, the fair inferences from the record reveal the following: 1) The Foothill and Mission Boulevard alignment, which was the route described to the voters when they passed Measure B, is no longer under serious consideration. When the summary judgment motion was argued, ACTA's counsel conceded that the Foothill and Mission Boulevard "is not the route that is currently being considered" because it was studied and found to be infeasible. 2) The Hayward Bypass Project, the current preferred alternative for the Route 238 project in environmental planning documents and in ACTA's strategic plan, is different in material respects from the Foothill and Mission Boulevard alignment. In responding to requests for admissions, ACTA admitted it "has been aware since at least January 1987, that the Hayward Bypass Project, as currently defined by ACTA, does not conform to the project description and location map contained in the 1986 Alameda County 'Measure B' ballot Measure." 3) Sales and use tax funds generated from the voter-approved Measure B are currently being spent on environmental review and traffic studies and will continue to be spent on the Route 238 project for the purpose of implementing the Hayward Bypass route. In the summary judgment proceeding, ACTA did "not dispute that without Measure B funds, the proposed alignment (or any other alignment) for the Route 238 Project could not and will not be built." 4) ACTA has no intention of amending the voter-approved Expenditure Plan to redefine the Route 238 project using the Hayward Bypass route and going through the same public review and approval process the original plan underwent prior to its adoption, based on its belief it has no "legal obligation" to do so.

We are cognizant that courts have found a case or controversy ripe for review where "the parties are in fundamental disagreement over the construction of particular legislation, or they dispute whether a public entity has engaged in conduct or established policies in violation of applicable law. [Citations.]" (*Alameda County Land Use Assn.* v. *City of Hayward* (1995) 38 Cal.App.4th 1716, 1723 [45 Cal.Rptr.2d 752], and cases cited therein.) The central question raised by the parties to this case—whether ACTA has the statutory authority to expend Measure B funds to implement a route or alignment for the Route 238 project that is different from the one put before the Alameda County voters in 1986—is purely a legal issue upon which the parties express fundamental disagreement. Resolution of this issue requires an interpretation of the Act, upon which the facts in this case will have little bearing. (See *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485, 1499 [234 Cal.Rptr. 779].)

In considering whether issues are ripe for review, account should also be taken of the public interest in a prompt answer to a particular legal question and the relative hardship on the parties if a decision is deferred. (*Pacific Legal Foundation* v. *California Coastal Com., supra*, 33 Cal.3d at p. 171.) We believe these considerations strongly militate in favor of a finding of ripeness. Appellants allege respondents are under a present duty imposed by the Act to use Measure B sales and use tax funds only for projects approved by the voters and that respondents are "improperly and illegally" expending Measure B funds to implement an unauthorized project. Absent judicial action, respondents have given every indication that they will, in effect, continue to exercise the very power that appellants claim they do not have and proceed with the putative project. Dismissing this appeal would require the parties to make the identical arguments at a later stage of these proceedings, after an expenditure of large sums of public money on a highly controversial project, the legality of which is still in question. Failure to resolve the tendered issue now will only create "lingering uncertainty" with respect to a transportation project that is the subject of widespread public interest in the Bay Area, and particularly Alameda County. (*Id.* at p. 170.) Based on all of these factors, we conclude the issues raised in this controversy have " 'sufficiently congealed' " to the point of concreteness to justify review. (*Id.* at p. 171.)

B. *Legal Authority Under the Act*

■ As already noted, in November 1986, the voters of Alameda County approved Measure B, after being told in the ballot information that the proceeds from the sales and use tax imposed by the measure would be used to "to improve, construct, maintain, and operate certain transportation projects and facilities contained in the Transportation Expenditure Plan adopted by the Board of Supervisors of Alameda County, . . ." Was it the purpose of this sales and use tax measure to provide funds to implement only those transportation projects as set forth in the Expenditure Plan at the time of the election, as argued by appellants? Or, on the other hand, did the voters impose the sales and use tax to fund transportation projects with fixed termini—beginning and end points as established by the Expenditure Plan—with the understanding that the alignment or route connecting the termini could be materially changed at the sole discretion of state highway authorities, as argued by respondents? In resolving this dispute, we are not bound by the trial court's construction of the Act because its ruling on summary judgment is reviewed de novo. (*Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

■ "When we interpret a statute, we attempt to determine legislative intent so as to effectuate the purpose of the law. [Citation.] The first thing

we do is read the statute, and do so in an ordinary way unless special definitions are provided. [Citation.] If the meaning of the words is clear, then the language controls. [Citation.] But if the meaning of the words is not clear courts can use interpretative aids; with respect to voter-approved enactments, these aids include the ballot analysis, the official summary, and the arguments presented to the voters. [Citations.]" (*Professional Engineers* v. *Wilson* (1998) 61 Cal.App.4th 1013, 1019-1020 [72 Cal.Rptr.2d 111].)

The Act provides that a county transportation authority, such as ACTA, is specifically charged with the responsibility for "administer[ing] the county transportation expenditure plan" which sets forth the "essential traffic and transportation projects" needing voter-supported local funding if they are to be completed. (§§ 131300; 131051, subd. (a)(1).) In requesting the voters to shoulder a greater tax burden in order to fund the projects contained in the county transportation expenditure plan, the Legislature has specified that the expenditure plan, *in its entirety*, is to be included in the voter information handbook.[5]

Once the election has been held and the voter-approved tax imposed, a county transportation authority "in administering the adopted county transportation expenditure plan and imposing the retail transactions and use tax, shall have only those powers necessary for those purposes." (§ 131057.) The Legislature mandated that all funds generated from a voter-approved sales and use tax, after deduction for expenses, "shall be used for the planning, design, construction, and operation of the traffic and transportation projects *as set forth in the adopted plan*, . . ." (§ 131107, italics added.) The Act reiterates: "All allocations of revenues derived from the adoption of a retail transactions and use tax ordinance in a county *shall be consistent with the priorities established by its county transportation expenditure plan*." (§ 131101, italics added.)

The diversion of these funds cannot be justified upon the ground that a project described to the voters in the county transportation expenditure plan

[5]By motion dated August 7, 1998, appellants requested this court to take judicial notice of several versions of Senate Bill No. 878, the legislation which was the precursor to the Act. This request was granted by order dated August 27, 1998. The materials submitted reflect that in early versions of Senate Bill No. 878, the sample ballot was required to contain "the full proposition as set forth in the ordinance calling the election." However, on September 13, 1985, Senate Bill No. 878 was amended to include the requirement that the sample ballot shall contain "the full proposition, as set forth in the ordinance calling the election, and *the voter information handbook shall include the entire adopted county transportation expenditure plan*." This language appears in the final version of the Act adopted by the Legislature. (§ 131108, subd. (h), italics added.) Appellants contend that the above described amendment of Senate Bill No. 878 reflects "that the [L]egislature's intent was to have the voters consider, not only the sales tax measure itself, but also the Expenditure Plan when they voted."

has been studied and found to be impractical, or upon the ground that a new project better achieves the transportation objectives sought to be realized by the voter-approved project. Once voters have approved a specific tax to implement a county transportation expenditure plan, an "amendment which adds or deletes a project, *or is of major significance*," must once again be submitted to the review and approval process. (§§ 131304, 131203.)

The ballot materials submitted to the voters when they approved Measure B breathed life into this statutory language. The voter information handbook advised voters that Measure B would generate sales and use tax funds "to improve, construct, maintain, and operate certain transportation projects and facilities *contained in the Transportation Expenditure Plan* adopted by the Board of Supervisors of Alameda County, which plan is incorporated here by this reference as though fully set forth herein, and as that Plan may be amended from time to time pursuant to applicable law." (Italics added.) If passed, it would "authorize the Authority to impose for no more than [15] years a retail sales/use tax of one-half of one percent to rehabilitate the Nimitz Freeway, aid mass transit, and realize the other traffic and *transportation projects/purposes set forth in the Alameda County Transportation Expenditure Plan; . . .*" (Italics added.) The voters were assured that the "proceeds of the taxes imposed by this ordinance shall be used *solely for the projects and purposes set forth in the County Transportation Expenditure Plan* and for the administration thereof." (Italics added.)

Therefore, the Act itself, its legislative history, and the ballot language all point to one conclusion—that when the voters of Alameda County agreed to tax themselves under Measure B, they voted with the understanding that the authority of the county to use the funds so generated was limited to and defined by the terms of the Expenditure Plan, which included a precise description of the Route 238 project. In our view, this statutory limitation on the use of the tax so levied serves the dual function of educating voters *before* an election about the specific transportation projects to be funded by the tax so they can intelligently cast their ballots, and it also ensures greater public accountability *after* the election for expenditures made by county transportation authorities, such as ACTA. It ensures that informed voters can make informed choices. If the tax revenues generated by Measure B may now be taken and applied to an entirely new highway alignment for which no tax was authorized, the many protections the Act provides—full disclosure of the expenditure plan, strict limitations on the use of voter-generated tax revenues, and voter involvement in expenditure plan amendments—are thus evaded, affording no protection whatsoever to taxpayers.

Respondents never come to grips with the language contained in the Act, and they virtually ignore the ballot information submitted to the voters.

Instead, they rely on Streets and Highways Code sections 71 and 90 as purportedly authorizing Caltrans and the California Highway Commission (the Commission) to relocate the voter-approved route between designated points or termini subsequent to the election.[6] They direct our attention to authority interpreting these sections as prohibiting taxpayers from controlling the discretionary action of state highway officials in relocating state highways and expending state funds thereon. (See *Holloway* v. *Purcell* (1950) 35 Cal.2d 220, 223 [217 P.2d 665]; *City of National City* v. *State of California* (1983) 140 Cal.App.3d 598, 604 [189 Cal.Rptr. 682]; 5 Ops.Atty.Gen. 95 (1945); 11 Ops.Atty.Gen. 193 (1948). Respondents argue "the more specific statutes contained in the Streets and Highways Code take precedence and allow [Caltrans] to control the routes between designated termini of all state highways."

We perceive no conflict. Respondents have confused the authority of state highway officials to make a legally sanctioned change in the route of a state highway with the power to redesign a project specifically authorized and funded by a vote of the people under the terms of the Act. In the first situation, the courts will not interfere with the exercise of state highway officials' discretion. In the latter, state highway officials have no discretion to exercise. Appellants recognize this distinction when they "readily admit that Measure B set no constraints on where Caltrans could decide to build the Hayward Route 238 project." However, appellants "vehemently reject respondents' argument that Measure B set no constraints on which Route 238 project alignments were eligible for funding through that Measure's sales tax receipts."

We find this argument persuasive. The proposition submitted to the voters of Alameda County was, by its very terms, limited to funding certain specific projects described in the Expenditure Plan. The voters did not authorize expenditure of the sales and use tax money to be used in a manner vested to the unbridled discretion of Caltrans. This is contrary to the express terms of the ballot information submitted to the voters and the express terms of the Act.

It is also contrary to the limits placed on the statutory power given to these agencies to determine state highway routing under the Streets and Highway

---

[6]Streets and Highway Code section 90 provides, in pertinent part: "The department shall have full possession and control of all state highways and all property and rights in property acquired for state highway purposes. The department is authorized and directed to lay out and construct all state highways between the termini designated by law and on the locations as determined by the commission." Additionally, Streets and Highways Code section 71 provides that: "The commission may alter or change the location of any State highway if in the opinion of the commission such alteration or change is for the best interest of the State."

Code. While the Legislature has vested the Commission with the power to "[s]elect, adopt, and determine the location for State highways," the highways must be situated *"on routes authorized by law."* (Sts. & Hy. Code, § 75, subd. (a), italics added.) Furthermore, the Commission's power to determine the location of state highways is not exclusive, contrary to the trial court's characterization. The Commission shares its powers concurrently with the Legislature, as evidenced by section 79 of the Streets and Highways Code, which provides: "This delegation of power to the commission *shall not be deemed exclusive,* but any of the powers herein enumerated may continue to be exercised by the Legislature itself while in session." (Italics added; see *Board of Supervisors* v. *California Highway Commission* (1976) 57 Cal.App.3d 952, 959 [129 Cal.Rptr. 504].) Thus, the legislative authority granted the Commission to alter or change the location of state highways may be significantly limited or denied by a subsequent act of the Legislature, such as by its adoption of the Act.

Respondents frame their arguments around section 131051, subdivision (a)(1), requiring that "any state highway project is subject to approval by the department." This language does not suggest that it was intended to supersede all of the protections afforded by the Act, nor does it purport to grant exclusive authority in Caltrans to reassess, and unilaterally reconfigure, state highway projects presented to the electorate under the Act after they have received voter approval. After all, the legislation by its very terms envisions approval or rejection of a state highway project contained in a county transportation expenditure plan—it does not provide Caltrans with the authority to change the plan once it has been adopted by the voters.[7]

The procedural history of this case indicates how section 131051, subdivision (a)(1) was interpreted and carried out by the agencies responsible for its implementation before the instant controversy arose. The record reveals that Caltrans did review and approve the original project alignment at the genesis of the Expenditure Plan approval process, before it was approved by local governmental entities and considered by the voters. On July 9, 1986, Mr. Burch Bachtold, director of Caltrans District 4, approved the state

---

[7]The pertinent language is found in section 131051, which defines the components of a county transportation expenditure plan. The expenditure plan is to include "[a] list of essential traffic and transportation projects in the order of priority within the county, and their respective sponsoring agencies, which current estimates of federal, state, and local funds indicate are insufficient to provide for their completion. The types of projects may include, but are not limited to, capital, maintenance, repair, or operation projects. . . . In addition, *any state highway project is subject to approval by the department.* Any project estimated to have adequate funding shall not be included on the list." (§ 131051, subd. (a)(1), italics added.)

highway projects included in the Expenditure Plan, including the Route 238 Measure B project "along Foothill and Mission Boulevard to Industrial Parkway" as conforming to current Caltrans route concepts. The obvious purpose in having Caltrans review and approve state highway projects during the incipient stage of the Expenditure Plan formulation was to correct any project deficiencies at a point in the process where the project could be unilaterally redesigned without having to seek voter approval. If Caltrans had the claimed power to unilaterally alter the Expenditure Plan after it received voter approval, there would have been no need for this early review.

We do not view our holding today as interfering with the discretionary powers of local and state transportation officials, as urged by respondents. If local officials had desired the discretionary power to select a primary road between the State Route 238/Interstate 580 interchange and Industrial Boulevard termini after the election, it would indeed have been a simple matter to so word the Expenditure Plan before its submission to the electorate. Instead, the Expenditure Plan included a project that was fully described and depicted in an accompanying map as running "along Foothill and Mission Boulevard." The voters of Alameda County authorized ACTA to collect and distribute sales and use tax money for the funding of this alignment, not some other route to be designated in the future.

Furthermore, had only the termini been designated, or the now-preferred Hayward Bypass alignment been specified, the result of the election might have been entirely different. A decision was made not to do this, and appellants have presented a declaration raising the inference that this approach was adopted deliberately to defuse anticipated controversy over this project.[8] ACTA cannot now, by hindsight, secure a judicial amendment of the Expenditure Plan. In this regard, there is nothing, of course, that would

---

[8]In the proceedings below, appellants proffered the declaration of Robert G. Knox III, who served on the Alameda County Board of Supervisors at the time Measure B was enacted. He served as the chairman of the ACTC, which developed the Expenditure Plan, until November 4, 1986, at which point he served as the first chairman of respondent ACTA. His declaration indicates: "I was present at the ACTC meetings where the ballot language for the Alameda County Transportation Expenditure Plan ('ACTEP') was considered. ACTC was very concerned about the language contained in the ACTEP, because that language would appear as part of the Transportation [s]ales and use tax ballot measure, to be known as 'Measure B,' that was to be placed on the ballot for the November, 1986 general election. [¶] . . . It is my memory and recollection that the Foothill-Mission Boulevard alignment of the Route 238 Hayward project, as described and marked in the ACTEP and as it appeared in the November 1986 voters' handbook, was not an error, but a deliberate act of ACTC. The purpose of this action, as discussed at the time by ACTC, was to allay concerns of would-be opponents of Measure B. ACTC felt that taking Route 238 behind Centennial Hall and through the hills

prevent ACTA from amending the Expenditure Plan and submitting it to the review and approval process, or from unqualifiedly renouncing any Measure B fund participation in this project.

In sum, the grant of summary judgment to respondents cannot be justified on either of the purported grounds given by the trial court—that the issues posed by appellants' lawsuit are not ripe for adjudication or, alternatively, that Streets and Highways Code section 90 grants Caltrans exclusive jurisdiction over route or alignment selection for state highways. Although requested to do so, we cannot rule on appellants' entitlement to injunctive relief or to enter a judgment in favor of appellants at this stage of the proceedings because these determinations hinge on questions of fact left unresolved in the summary judgment proceeding below.[9] "[T]he function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

## IV.

### DISPOSITION

The judgment is reversed and the matter remanded for further proceedings consistent with this opinion.

Kline, P. J., and Haerle, J., concurred.

---

area would be more disruptive to the environment than using the existing Mission Boulevard right-of-way. . . ."

[9]For instance, the briefing in this appeal reveals that the parties disagree on the precise alignment approved by the voters for the Route 238 project in 1986, the level to which the Hayward Bypass alignment represents a substantial deviation from the route depicted to the voters, and whether the environmental and planning documents indicate a virtual abandonment of the Foothill and Mission Boulevard alignment. All of these issues are factual, are highly material to the relief sought, and are not susceptible to resolution by summary judgment or adjudication.