[No. A098526. First Dist., Div. Two. Mar. 25, 2004.]

SAN DIEGO COUNTY WATER AUTHORITY et al., Plaintiffs and Appellants, v.
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.C., III.D. and III.E.

## COUNSEL

Brobeck, Phleger & Harrison, James N. Penrod, David J. Brown, Thomas M. Peterson, Catherine A. Jackson; Hatch and Parent, Christine M. Frahm; and Daniel S. Hentschke for Plaintiffs and Appellants.

Jeffrey Kightlinger, James Roberts; Bingham McCutchen, David M. Heilbron, James J. Dragna, Anthony T. Falzone and Marta E. Miyar, for Defendants and Respondents Metropolitan Water District of Southern California and Board of Directors of the Metropolitan Water District of Southern California.

Rockard J. Delgadillo, City Attorney, Richard M. Helgeson and Arthur B. Walsh, Assistant City Attorneys, for Defendant and Respondent City of Los Angeles.

Lemieux & O'Neill and Stephen P. O'Neill for Defendants and Respondents Central Basin Municipal Water District, Foothill Municipal Water District, Las Virgenes Municipal Water District and West Basin Municipal Water District.

Richard, Watson & Gerson and James L. Markman for Defendants and Respondents City of Beverly Hills and City of San Marino.

Terry B. Stevenson, Assistant City Attorney, for Defendant and Respondent City of Burbank.

Jones & Mayer and Kimberly Hall Barlow for Defendant and Respondent City of Fullerton.

Robert E. Shannon, City Attorney, and Donna F. Gwin, Deputy City Attorney, for Defendant and Respondent City of Long Beach.

Joseph W. Fletcher, City Attorney, and Jose Sandoval, Assistant City Attorney, for Defendant and Respondent City of Santa Ana.

Legrand H. Clegg II, City Attorney, and Wilmont A. Odom, Chief Deputy City Attorney, for Defendant and Respondent City of Compton.

Scott H. Howard, City Attorney, and Steven G. Lins, Assistant City Attorney, for Defendant and Respondent City of Glendale.

Michele Beal Bagneris, City Attorney, and Scott Rasmussen, Assistant City Attorney, for Defendant and Respondent City of Pasadena.

Marsha Jones Moutrie, City Attorney, and Joseph Lawrence, Assistant City Attorney, for Defendant and Respondent City of Santa Monica.

John L. Fellows III, City Attorney, and Ronald T. Pohl, Assistant City Attorney, for Defendant and Respondent City of Torrance.

Jack L. White, City Attorney, and Lawrence S. Newberry, Senior City Attorney, for Defendant and Respondent City of Anaheim.

Cihigoyenetche, Grossberg & Clouse and Jean Cihigoyenetche for Defendant and Respondent Inland Empire Utilities Agency.

Brunick, Battersby, McElhaney & Beckett and Steven M. Kennedy for Defendant and Respondent Three Valleys Municipal Water District.

Best Best & Krieger and Arthur L. Littleworth for Defendant and Respondent Western Municipal Water District of Riverside County.

Redwine & Sherrill and Gerald D. Shoaf for Defendant and Respondent Eastern Municipal Water District.

McCormick, Kidman & Behrens, Russell G. Behrens and Janet R. Morningstar for Defendant and Respondent Municipal Water District of Orange County.

Law Offices of E. Clarke Moseley and E. Clarke Moseley for Defendant and Respondent Upper San Gabriel Valley Municipal Water District.

Ferguson, Case, Orr, Patterson & Cunningham and Doug Kulper for Defendant and Respondent Calleguas Municipal Water District.

**OPINION**

**RUVOLO, J.—**

## I.

### INTRODUCTION

Plaintiff San Diego County Water Authority (San Diego) and several of the individuals it serves have sued the Metropolitan Water District of Southern

California (Metropolitan), its board of directors, and its 25 member public agencies for declaratory and injunctive relief, primarily challenging the validity and constitutionality of Metropolitan's interpretation of section 109-135 of the Metropolitan Water District Act[1] (72B West's Ann. Wat. Code— Appen. (1995 ed.) § 109-135, p. 43) (section 135). Under section 135, in the event of a water supply shortage, each Metropolitan member public agency, including San Diego, has a preferential right to a percentage of Metropolitan's available water supplies based on a legislatively established formula. That formula affords each member an aliquot preference equal to the ratio of that member's total accumulated payments toward Metropolitan's capital costs and operating expenses when compared to the total of all member agencies' payments toward those costs, excluding amounts paid by the member for "purchase of water."

San Diego argues that since a significant portion of Metropolitan's water sales revenue goes toward capital costs and operating expenses, section 135 should include that portion of water sales revenue in the calculation of its members' preferential rights. In the published portion of this opinion, we conclude that Metropolitan has properly interpreted section 135. In the unpublished portion, we reject San Diego's alternative claims, including that Metropolitan's interpretation violates the California Constitution. Consequently, we affirm.

## II.

### Facts and Procedural History

Metropolitan was created by state legislation in 1927. (Stats. 1927, ch. 429, § 2, p. 694.) Shortly thereafter, Metropolitan was described in the case of *Metropolitan Water Dist. v. Whitsett* (1932) 215 Cal. 400 [10 P.2d 751] as follows: "The petitioner, Metropolitan Water District of Southern California, is a public corporation, organized and existing under the 'Metropolitan Water District Act'. [Citation.] The purpose of its organization was to acquire the right to and to conduct waters from the Colorado River for distribution to the municipalities within and a part of the district for domestic and other useful purposes. The cities within the district are numerous, some organized and existing under freeholders' charters and some under general law. The district has broad powers in connection with the object of its creation, including the power, by vote of the electors in the district, to issue and sell bonds; to levy and collect general taxes within the participating municipalities; to acquire water and other rights and property; to perform construction work; 'to enter

---

[1] All further undesignated statutory references are to the Metropolitan Water District Act (72B West's Ann. Wat. Code (1995 ed.) §§ 109-1 et seq.) (the Act).

into contracts, to employ and retain personal services and employ laborers'; and generally to do and perform all things necessary to carry out the purposes of the district under the act. The governing body of the district is a board of directors, consisting of at least one representative from each municipality, the area of which shall lie within the district." (*Id.* at pp. 406–407.)

Almost 75 years later, Metropolitan was described in a somewhat more expansive fashion in *Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403 [96 Cal.Rptr.2d 314] (*Metropolitan*): "[Metropolitan] provides about 60 percent of the water used in Southern California. The Metropolitan Water District's service area covers 5,200 square miles. It includes all or parts of Los Angeles, Orange, San Diego, and Ventura Counties. More than 16,000,000 people, half the population in California, live in the Metropolitan Water District's service area." (*Id.* at p. 1416.) The court went on to describe the vastness of Metropolitan's facilities: "The Metropolitan Water District owns and operates water conveyance and storage facilities including the Colorado River Aqueduct, which imports water from the Colorado River; over 775 miles of pipelines and canals; water treatment plants; reservoirs; dams; and pumping facilities. . . . The Metropolitan Water District is currently constructing the Eastside Reservoir Project, a surface water reservoir. Also 'pending' is the Inland Feeder Project which involves integration of two aqueducts and the Eastside River Project. The Metropolitan Water District issues bonds to finance construction or to purchase facilities. Debt service and operation and maintenance costs for the Metropolitan Water District[']s infrastructure are included in water rates charged to member agencies." (*Id.* at p. 1417.)

The principal plaintiff in this case, San Diego, is a public water agency and a member agency of Metropolitan. It relies on Metropolitan to provide the imported water supply necessary to meet the needs of the region's $103 billion economy and to sustain the quality of life of the nearly three million people who live and work there. Currently, San Diego is Metropolitan's largest water purchaser and is completely dependent upon Metropolitan for its water supply. (*Metropolitan, supra,* 80 Cal.App.4th at p. 1408, fn. 3.) This imported water supply constitutes up to 90 percent of the region's annual water supply requirements.

The interpretation of section 135 underlies the parties' dispute. It is under this section that Metropolitan confers preferential rights to water during times of scarcity. It does so on the basis of property taxes and other financial contributions made by its members for Metropolitan's capital and operating costs, exclusive of water sales. The 77-year-old legislative formula for calculating these preferential rights is set out in section 135: "Each member public agency shall have a preferential right to purchase from the district for

distribution by such agency, or any public utility therein empowered by such agency for the purposes, for domestic and municipal uses within the agency a portion of the water served by the district which shall, from time to time, bear the same ratio to all of the water supply of the district as the total accumulation of amounts paid by such agency to the district on tax assessments and otherwise, *excepting purchase of water*, toward the capital cost and operating expense of the district's works shall bear to the total payments received by the district on account of tax assessments and otherwise, excepting purchase of water, toward such capital cost and operating expense." (Italics added.)

Metropolitan calculates its members' preferential rights annually and publishes its calculations. Historically it has sold each of its member agencies, including San Diego, the quantity of water requested, regardless of whether it was more or less than the amount to which the member had a preferential right. Nevertheless, in the event of a water supply shortage or drought, any Metropolitan member agency can request that its preferential rights be invoked. However, since the current version of the statute was established in 1931, such a right of preference has never been exercised, even in response to past statewide droughts.

Section 135 exists within the statutory penumbra of the Water Code's more apocalyptical section 350 (Wat. Code, § 350), which grants water providers vast discretion in meeting water emergencies. This delegation grants water providers authority to declare a "water shortage emergency . . . whenever it finds and determines that the ordinary demands and requirements of water consumers cannot be satisfied without depleting the water supply of the distributor to the extent that there would be insufficient water for human consumption, sanitation, and fire protection." A water shortage emergency condition within the meaning of this section includes both an immediate emergency, in which a district is presently unable to meet its customers' needs, and a threatened water shortage, in which a district determines that its supply cannot meet an increased future demand. (*Building Industry Assn. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1646 [1 Cal.Rptr.2d 625].) When a water distributor's governing body declares an emergency shortage, it must adopt regulations that will, in its "sound discretion," conserve the water supply for the greatest public benefit. (Wat. Code, § 353.) The regulations adopted pursuant to Water Code section 350 "shall prevail over the provisions of such laws relating to water rights for the duration of the period of emergency," thereby preempting the preferential rights calculations made under section 135. (Wat. Code, § 357.) The statutory boundaries of Water Code section 350 and its interrelationship with section 135 remain largely undefined, although one commentator surmises, "the state Water Code governing water shortage emergencies appears to make preferential rights unenforceable." (Erie & Joassart-Marcelli, *Unraveling Southern California's*

*Water/Growth Nexus: Metropolitan Water District Policies and Subsidies for Suburban Development, 1928–1996* (2000) 36 Cal. Western L.Rev. 267, 290, fn. omitted.)[2]

San Diego claims that Metropolitan interprets section 135 improperly and does not give it preferential rights credit for substantial payments San Diego makes that are undisputedly used for Metropolitan's capital costs and operating expenses. These payments are made by paying Metropolitan's water rates, which are currently the primary means by which Metropolitan covers its capital and operating expenses. Yet, Metropolitan "calculates the purported preferential rights of its member public agencies annually and excludes any credit for revenues paid to Metropolitan as water rates in conjunction with delivery of water despite the fact that these revenues provide the majority of the financial contribution toward Metropolitan's capital costs and operating expenses." Instead, San Diego asserts that if correctly interpreted, section 135 requires that Metropolitan's calculation include that portion of the water rates being used by Metropolitan for capital expenditures and operating expenses, excepting only that portion spent for the direct purchase of water.

As a result of Metropolitan's calculations, San Diego, which purchases more water than any other member agency, is allocated preferential rights to less than 15 percent of Metropolitan's available water supply. This is so despite the fact that San Diego has contributed over 22 percent of Metropolitan's capital costs and operating expenses, largely through these water purchases. Thus, San Diego alleges that its "water supply needs" exceed its calculated preferential rights under section 135 by almost 50 percent, "leaving half of San Diego's water supply vulnerable to pre-emptive claims by others."

---

[2] Despite the fact that neither section 135 nor Water Code section 350 is being affirmatively enforced in this litigation, we find that the issues presented by San Diego's claims are ripe for judicial decision now. Before a controversy is ripe for adjudication it " 'must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.]' " (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170–171 [188 Cal.Rptr. 104, 655 P.2d 306], quoting *Aetna Life Ins. Co. v. Haworth* (1937) 300 U.S. 227, 240–241 [81 L.Ed. 617, 57 S.Ct. 461].) Thus, "[t]he legal issues posed must be framed with sufficient concreteness and immediacy so that the court can render a conclusive and definitive judgment rather than a purely advisory opinion based on hypothetical facts or speculative future events. [Citation.]" (*Hayward Area Planning Assn. v. Alameda County Transportation Authority* (1999) 72 Cal.App.4th 95, 102 [84 Cal.Rptr.2d 744].) In *Hayward Area Planning Assn.*, this court found that a writ claim challenging the scope of the agency's statutory authority was ripe because the action presented "purely a legal issue upon which the parties express fundamental disagreement." (*Id.* at p. 103; see also *Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1723 [45 Cal.Rptr.2d 752] [declaratory relief claim was appropriate where "the parties are in fundamental disagreement over the construction of particular legislation . . . ."].) We address the merits of this controversy because the primary issue tendered is purely a legal one—whether section 135 is properly construed by Metropolitan, upon which the facts in this case will have little bearing.

On the other hand, San Diego claims that its comember, respondent City of Los Angeles (Los Angeles), has improperly received "a windfall" from this method of calculation. It points out that Los Angeles, one of Metropolitan's founding member agencies with a large tax base, has contributed more in property taxes than any other member agency, largely to finance, construct and operate the Colorado River Aqueduct, thereby accumulating preferential rights credit in the process. However, it makes water purchases from Metropolitan only to supplement its water supply needs. In expanding on this point, a recent law review article has explained how Los Angeles slakes its municipal thirst for water this way: "Los Angeles, whose taxpayers paid 75% of the costs of the Colorado River Aqueduct, drew little [Metropolitan] water—only 8% of total deliveries—because the city continued to develop its own water supplies. In the 1930's, Los Angeles extended its system to the Mono Lake Basin. Later, in 1970, the city completed a second aqueduct to the Owens Valley. Owens Valley water was far cheaper because it featured a gravity-flow system while [Metropolitan] needed costly pumping plants to move its Colorado River water over desert mountains." (Erie & Joassart-Marcelli, *Unraveling Southern California's Water/Growth Nexus, supra,* 36 Cal. Western L.Rev. at p. 273.) As a result, San Diego complains that Los Angeles has contributed only 12 percent of Metropolitan's capital costs and operating expenses, while enjoying preferential right to 22 percent of Metropolitan's water supply, because it has paid its full complement of property taxes while using Metropolitan only as a supplemental water source. Because of its advantageous position, San Diego claims that Los Angeles has opposed attempts to "correct" Metropolitan's erroneous interpretation and application of section 135.

San Diego's first amended complaint alleges 10 causes of action that may roughly be divided into two groups—the first group challenges Metropolitan's administrative interpretation of section 135, and the second group raises constitutional and other equitable considerations if Metropolitan's interpretation is upheld. Specifically, San Diego's first and second causes of action seek declaratory relief as to the statutory interpretation of section 135. The third, fourth, and fifth causes of action seek declaratory relief as to the constitutionality of section 135 as currently interpreted and applied by Metropolitan. The sixth cause of action seeks to estop Los Angeles "from asserting claims or demand for its preferential rights as interpreted by Metropolitan under [s]ection 135 . . . ." The seventh cause of action seeks an accounting to substantiate San Diego's claim "that the overwhelming majority of the dollars collected from [San Diego] in conjunction with water sales were applied directly to the capital costs and operating expense of Metropolitan's works." The eighth and ninth causes of action seek injunctive relief enjoining Los Angeles from invoking, and Metropolitan from implementing, preferential rights under section 135 "at the expense of depriving [San Diego] of the

relative percentage of water it historically has obtained from Metropolitan . . . ." The tenth cause of action seeks a writ of mandate based on Metropolitan's claimed "duty to interpret and enforce [s]ection 135 in a manner that is constitutional and in accordance with principles of common law and equity . . . ."

Metropolitan and Los Angeles filed demurrers asserting that each cause of action failed to state facts sufficient to constitute a cause of action. As noted, there are 25 Metropolitan member public agencies besides San Diego. Twenty-four of these member public agencies joined Metropolitan's demurrer (one stayed neutral). The trial court sustained the demurrers without leave to amend, and on March 25, 2002, filed a judgment dismissing the first amended complaint. San Diego filed a timely notice of appeal.[3]

## III.

### DISCUSSION

### A. *Standard of Review*

■ The standard of review on appeal from a judgment dismissing an action after sustaining a demurrer is well settled. "The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317]; *Shvarts v. Budget Group, Inc.* (2000) 81 Cal.App.4th 1153, 1157 [97 Cal.Rptr.2d 722].) Here, we are called upon to review the language of section 135. Where the material facts are conceded or undisputed, as in this case, the issue becomes one of statutory interpretation and therefore is purely a question of law which is independently reviewed. (*People v. Duz-Mor Diagnostic Laboratory, Inc.* (1998) 68 Cal.App.4th 654, 660 [80 Cal.Rptr.2d 419]; *R & P Capital Resources, Inc. v. California State Lottery* (1995) 31 Cal.App.4th 1033, 1036 [37 Cal.Rptr.2d 436].) Even so, " '. . . "the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. [Citation.]" ' [Citation.]" (*Citicorp North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1418 [100

---

[3] The City of Los Angeles and Metropolitan, including its member agencies, are represented by separate counsel and have filed separate briefs on this appeal. However, Metropolitan and Los Angeles have each joined in the arguments made by the other to the extent they are applicable. Thus, unless we indicate to the contrary, each of the arguments discussed below is applicable to each respondent.

Cal.Rptr.2d 509], quoting *Yamaha Corp. of America v. State Bd. of Equalization* (1988) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

**B.   First and Second Causes of Action—Statutory Interpretation**

San Diego's first and second causes of action seek declaratory relief as to the statutory interpretation of section 135. These claims arise from the important historical fact that in the 1960's and 1970's, Metropolitan's major source of revenue shifted from property taxes to charges for water sold to its member agencies. (See generally Erie & Joassart-Marcelli, *Unraveling Southern California's Water/Growth Nexus, supra*, 36 Cal. Western L.Rev. at p. 273.) For example, when the *Metropolitan* opinion was issued in 2000, approximately 75 percent of Metropolitan's revenues were generated through rates charged to supply water to its member agencies. (*Metropolitan, supra*, 80 Cal.App.4th at pp. 1416–1417.) Revenues from water rates now account for over 90 percent of Metropolitan's total revenues. Moreover, Metropolitan now recovers almost all of its capital, operating, and maintenance costs through the sale of water to its member agencies. Indeed, water rate revenues currently pay for 100 percent of Metropolitan's operating expense and 85 percent of its capital costs.[4]

Because of this shift, San Diego's first cause of action alleges that "Metropolitan's calculation of preferential rights is arbitrary in light of the current funding formula," whereby those who purchase water are paying a substantial percentage of the capital costs and operating expenses without receiving any recognition in the form of preferential rights. It goes on to argue that Metropolitan has a duty to interpret and enforce section 135 "properly," and so ought to calculate preferential rights "according to each agency's total financial contributions [in particular including water purchase payments] toward . . . [Metropolitan's] capital costs and operating expense . . . ." Only in this way will section 135 comport with the apparent intention of the Legislature "of fairly and equitably allocating Metropolitan's water supplies among its member public agencies based on each member's total payments toward the capital costs and operating expense of Metropolitan's works."

---

[4] San Diego does not contend that Metropolitan engaged in untoward conduct by structuring its water rates to recoup most of its operating and capital expenses. That argument would be futile. Substantial deference must be given to the Board's determination of its rate design. (See generally *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 196 [29 Cal.Rptr.2d 128].) "Rates established by the lawful rate-fixing body are presumed reasonable, fair and lawful. [Citations.]" (*Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172, 1180 [233 Cal.Rptr. 22, 729 P.2d 186].)

Alternatively, San Diego's second cause of action seeks a judicial declaration invalidating section 135 based on these "changed circumstances." It alleges that because of the funding shift occurring over the past 40 years, section 135 no longer advances its legislative purpose and that it is "no longer . . . applicable" for calculating preferential rights.

█ Our review of these causes of action requires us to assess the meaning of the relevant provisions of section 135, a task of first impression. In doing so, we start with the well-established rule of statutory construction that we are to ascertain the intent of the Legislature so as to effectuate the purpose of the law. This is accomplished by turning first to the statutory language, giving effect to the ordinary meaning of the words employed. (*Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 756 [55 Cal.Rptr.2d 107, 919 P.2d 721].) " 'Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citations.]" (*Ibid.*)

As noted, the preferential rights clause was enacted in 1927 (Stats. 1927, ch. 429, § 5-1/2, p. 701) and later amended in 1931. (Stats. 1931, ch. 323, § 5-1/2, p. 817.) As part of the repeal and reenactment of the entire act in 1969, the preferential rights clause was renumbered as section 135. (Stats. 1969, ch. 209, § 135, pp. 506–507.) The parties agree on the statute's overall meaning. Paraphrasing the statutory language, San Diego explains: "Section 135 grants a preferential right to water in a ratio proportional to payments by [Metropolitan] members toward [Metropolitan's] capital costs and operating expenses excepting 'purchase[] of water.' " However, both Metropolitan and San Diego offer opposite interpretations of the important statutory language, "excepting purchase of water." San Diego argues that we must read the phrase "purchase of water" literally, with an insistence upon precise and uniform terminology. So viewed, San Diego claims that since section 135's intent and purpose was to give preferential rights credit to member agencies for all monies paid to Metropolitan and applied to capital costs and operating expenses, Metropolitan must include monies collected for capital costs and operating expenses as part of a purchase of water.[5]

To the contrary, Metropolitan has for over 70 years interpreted this language in section 135 to mean that "amounts paid for water purchases are

---

[5] On October 2, 2002, while this appeal was being briefed, San Diego filed a motion asking us to take judicial notice of certain documents relevant to Metropolitan's water rate structure. On October 31, 2002, we granted San Diego's request for judicial notice of these documents. These judicially noticed documents reveal that after the dismissal of San Diego's first amended complaint on demurrer, Metropolitan changed its water rate structure and approved the "unbundling" of its water rates. The unbundling documents purportedly show the numerous cost-based components that comprise Metropolitan's water rates, including those components used to fund capital costs and operating expenses.

not to be taken into account in determining preferential rights, whatever those amounts are used for." According to Metropolitan, a proper appreciation of the legislative history of section 135 should persuade us to reject San Diego's interpretation, and endorse its long-standing, consistent administrative interpretation of the statute which is entitled to " 'great weight and respect' . . . ." (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 12.)

The Legislature has not specifically defined the "excepting purchase of water" terminology at issue. However, "[w]ords and phrases are construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law . . . are to be construed according to such peculiar and appropriate meaning or definition." (Civ. Code, § 13.)

First, we conclude that section 135 does not imbue "excepting purchase of water" with a technical or distinctive meaning. Section 135 grants all member public agencies preferential rights credit in proportion to each agency's respective contribution toward capital costs and operating expenses with one exception—payments made by member agencies for "purchase of water." But where the operating expenses and capital costs of Metropolitan are included in the rate charged for the water, is a member entitled to receive preferential rights credits for that amount of the water charges attributable to these costs and expenses? The "plain meaning rule" of statutory interpretation (*Great Lakes Properties, Inc. v. City of El Segundo* (1977) 19 Cal.3d 152 [137 Cal.Rptr. 154, 561 P.2d 244]) is not dispositive because the words of the disputed phrase, "excepting purchase of water," are not clear on their face. However, the answer lies in applying another well-recognized tenet of statutory construction.

Where an examination of the plain wording of a disputed statutory term or phrase does not conclusively supply its meaning, the court should next consider the statutory context in which the disputed phrase appears, to determine if its meaning can be derived from harmonizing it with the overall statutory purpose of the scheme. (*Poway Unified School Dist. v. Superior Court* (1998) 62 Cal.App.4th 1496, 1503 [73 Cal.Rptr.2d 777].) Thus, the doctrine of noscitur a sociis (the meaning is derived from context) allows courts to find the meaning of a disputed phrase by reference to the entire enactment of which the phrase is a part. (*Gifford v. J & A Holdings* (1997) 54 Cal.App.4th 996, 1004 [63 Cal.Rptr.2d 253].) Where necessary, this involves drawing inferences as to meaning based on the context of the language under examination. (*San Rafael Elementary School Dist. v. State Bd. of Education* (1999) 73 Cal.App.4th 1018, 1022 [87 Cal.Rptr.2d 67].)

■ As noted, the general purpose of section 135 is to set forth a formula by which Metropolitan's members will be entitled to preference based on the amount each member contributes to Metropolitan's capital costs and operating expenses. In so doing, the statute excludes from the preference formula any amount of capital costs and operating expenses which might be included as part of the "purchase of water." Thus, the statute clearly contemplates that Metropolitan's charge for the "purchase of water" to its members may include amounts allocated for capital costs and operating expenses. Were it not so, there would be no reason to exclude the "purchase of water" from the preference formula.

For this reason we reject San Diego's interpretation of the phrase "purchase of water" as being intended to mean only "the cost of the water resource," and not the "bundled" charge for water inclusive of capital costs and operating expenses. If the phrase were so limited, there would be nothing to "except" from the formula. In other words, because the charge for the "water resource" itself does not include capital costs and operating expenses, there would have been no reason for the Legislature to "except" it from the formula.[6]

While resort to normal textual rules of statutory construction is sufficient to resolve the parties' dispute, the meaning we attribute to the phrase "excepting purchase of water" finds further support when it is considered in context, as a complementary portion of a statutory scheme. (See generally *Metropolitan, supra,* 80 Cal.App.4th at pp. 1424–1425.) It is another fundamental rule of statutory construction that "every statute should be construed with reference to all other statutes of similar subject so that each part of the law as a whole may be harmonized and given effect. [Citation.]" (*Franchise Tax Bd. v. Superior Court* (1998) 63 Cal.App.4th 794, 799 [73 Cal.Rptr.2d 889].)

We begin by noting that in reviewing the legislative scheme, it is abundantly evident that the Legislature has given Metropolitan's board of directors (Board) tremendous flexibility in generating its revenues.[7] The Board is empowered to impose rates and charges for water provided by the District. (§§ 130–134.) The Board may also raise revenue by assessing a property tax (§§ 109–305, 307); assessing a benefit assessment (§§ 134.6–134.9); issuing short-term revenue certificates (§§ 296–299.5); and incurring bonded indebtedness (§§ 200–295.3).

---

[6] Applying this same reasoning, we reject as well San Diego's attempt to draw any meaningful distinction between the Water Code's use of the alternative phrases "water rates" (which it argues can include capital and operating costs) and the "purchase of water."

[7] The Board is comprised of at least one representative from each member public agency plus additional representatives based on the assessed valuation of property within the member agency (§ 109–51).

The Board is also expressly authorized under section 134.5 to collect a water standby or service availability charge from its member agencies. "Standby and availability charges are fees exacted for the benefit which accrues to property by virtue of having water available to it, even though the water might not actually be used at the present time." (*Kennedy v. City of Ukiah* (1977) 69 Cal.App.3d 545, 553 [138 Cal.Rptr. 207].) It is apparent that section 134.5, added to the Act by the Legislature in 1984 (Stats. 1984, ch. 271, § 5, pp. 1434–1435), was intended to furnish an additional source of funding for the Board.

Significantly, the Legislature clearly contemplated, from section 135's inception, that revenue from water sales would ultimately be used to pay for Metropolitan's capital costs and operating expenses. Nevertheless, the Legislature enacted section 135, which specifically excludes water purchases from the preferential rights calculation. Indeed, the same legislative session that enacted what is now section 135 in 1931 (Stats. 1931, ch. 323, § 5-1/2, p. 817) also enacted what is now section 134, modified slightly by subsequent legislation. The 1931 statute provided: "The board of directors *shall fix such rate or rates for water furnished as will pay the operating expenses of the district*, provide for repairs and depreciation of works owned or operated by such district, pay the interest on any bonded debt, and, so far as practicable, provide a sinking or other fund for the payment of the principal of such debt as the same may become due; it being the intention of this section to require the district to pay the interest and principal of the bonded debt from the revenues of such district, so far as practicable. . . ." (Italics added.) (Stats. 1931, ch. 323, § 7, subd. (j), pp. 824–825.) The simultaneous enactment of the specific phrase at issue, "excepting purchase of water" in section 135, reflects the Legislature's desire to create an exception from the general rule that all revenue used to pay capital costs and operating expenses would count toward the calculation of preferential rights.

Moreover, during the very same session in which the Legislature amended section 134 and enacted sections 134.5–134.9, several bills were proposed that would have repealed the current version of section 135. The Legislature did not act on these bills. That the Legislature did not change section 135 at the same time it passed legislation amending related provisions again suggests Metropolitan's interpretation comports with legislative intent. (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 845–846 [157 Cal.Rptr. 676, 598 P.2d 836].)

In summary, we have uncovered nothing in section 135, its legislative history, or the overall statutory scheme supporting San Diego's argument that the Legislature intended the phrase "excepting purchase of water" to impose a requirement that Metropolitan break down its water rate into component parts

thereby giving preferential rights credit for "amounts . . . applied to the categories or classifications of capital costs and operating expenses." On the contrary, we conclude that the express leg islative intention indicates just the opposite. The legislative history, when coupled with the nature of the amendments to the statutory scheme over the years, reveals a legislative awareness and expectation that water rates would eventually generate sufficient revenues to pay the bulk of Metropolitan's capital and operating expenses. Notwithstanding this knowledge, the exception in section 135 is worded in broad terms, excepting the member agency's "purchase of water" from the preferential rights calculation.

Indeed, if the Legislature had wished to enact a version of section 135 embracing San Diego's position, it could have done so by simply omitting the explicit language "excepting purchase of water." In that way, the portion of water sales used to pay capital costs and operating expenses would be counted toward the accumulation of preferential rights. Instead, the Legislature's inclusion of the language "excepting purchase of water" supports the evident purpose of excluding any portion of water rates used to pay capital costs and operating expenses from the formula for calculating preferential rights. Consequently, San Diego's interpretation of section 135 renders the words "excepting purchase of water" meaningless surplusage, violating the rule of statutory construction to "give meaning to every word of a statute if possible." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [56 Cal.Rptr.2d 706, 923 P.2d 1].)

█ Finally, the fact that a statute may be harsh, unfair, inequitable or create hardships does not show that the Legislature did not mean what it said. The courts are not concerned with the expediency, wisdom or utility of legislative enactments so long as constitutional principles are not violated. (*Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 163 [211 Cal.Rptr. 368, 695 P.2d 665] [court may not "strike down a statute simply because we disagree with the wisdom of the law or because we believe that there is a fairer method for dealing with the problem"].) Even if this court thought it was a good idea to give San Diego preferential rights credit for the portion of capital costs and operating expenses paid from revenues raised by water sales, that determination is for the Legislature, not us, to make.[8] (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

---

[8] This court hesitates to pronounce the preferential rights formula in section 135 inequitable, as the various equities here are complex and do not yield an obvious solution. Indeed, setting water policy in this state has proven to be an exquisitely political endeavor. Thus, San Diego's policy concerns, expressed in a parade of horribles—uncertainty over its baseline water supply, inability to conduct long-range planning and development, and the potential hardships created by the deprivation of almost 50 percent of its water supply—must necessarily be addressed to the Legislature.

██ San Diego also questions the viability of section 135 in light of changed conditions. "As the facts have changed since [s]ection 135 was adopted to a situation in which a majority and ever increasing percentage of Metropolitan's capital costs and operating expenses are being paid with money raised within the water rate revenues, [s]ection 135 no longer is applicable for determining the relative allocation of water among the Member Agencies when demand exceeds supply." However, modification of a statute made obsolete by virtue of changed conditions is a legislative, not a judicial, prerogative. (See *Naismith Dental Corp. v. Board of Dental Examiners* (1977) 68 Cal.App.3d 253, 263 [137 Cal.Rptr. 133]. In *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 63 [195 P.2d 1], the California Supreme Court stated this rule clearly: " '[I]n the absence of a constitutional objection it is generally held that the courts have no right to declare a statute obsolete by reason of a supervening change in the conditions under which it was enacted. [Citations.]' " The proper forum for San Diego's "changed circumstances" argument is the Legislature, not here.

**C.–E.** *

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**IV.**

Disposition

The judgment is affirmed.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied April 15, 2004, and appellants' petition for review by the Supreme Court was denied July 14, 2004.

---

*See footnote, *ante*, page 13.